The SAUL ZAENTZ COMPANY d/b/a/ Tolkien Enterprises, Plaintiff,

v.

WOZNIAK TRAVEL, INC., Defendant.

No. C 06–5421 MHP.

United States District Court, N.D. California.

July 29, 2008.

Jeffrey E. Faucette, Martin R. Glick, Sarah Jean Givan, Blake Justin Lawit, Howard Rice Nemerovski Canady Falk & Rab, San Francisco, CA, for Plaintiff.

Dean C. Eyler, Jeremy L. Johnson, Norman M. Abramson, Laura J. Hein, Jennifer J. Olson, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, Jeffrey G. Knowles, Coblentz, Patch, Duffy & Bass, San Francisco, CA, Minneapolis, MN, for Defendant.

### MEMORANDUM & ORDER

MARILYN HALL PATEL, District Judge.

Defendant Wozniak Travel, Inc. ("Wozniak Travel") has operated, since 1976, a Minnesota-based travel agency named "Hobbit Travel." Plaintiff, Saul Zaentz Company d/b/a Tolkien Enterprises ("Tolkien Enterprises"), owns the right to use and license others to use marks related to novelist J.R.R. Tolkien's books *The Hobbit,* first published in the United States in 1938, and its sequel *The Lord of the Rings* trilogy, first published in the United States in 1954, 1955, and 1956. The term "Hobbit" refers not only to the title of J.R.R. Tolkien's first novel, but also refers to the race of small, human-like creatures who inhabit the mythical world of Middle Earth in which Tolkien's novels are set. Plaintiff alleges that Wozniak has used and continues to use the "Hobbit" mark unlawfully. Tolkien asserts various federal and state

causes of action for trademark infringement, trademark dilution, and unfair competition, and seeks both monetary and injunctive relief.

Now before the court are the parties' cross-motions for summary judgment on whether the affirmative defense of laches bars plaintiff's claims. Having considered the arguments of the parties and the papers submitted, and for the reasons stated below, the court GRANTS defendant's motion and DENIES plaintiff's motion. Defendant has also moved for summary judgment as to the merits of plaintiff's infringement, dilution and unfair competition claims, but because resolution of the laches issue in favor of defendant is dispositive, the court does not reach those additional issues. Rather, each of plaintiff's claims against defendant is DISMISSED.

*BACKGROUND*

I. *J.R.R. Tolkien's The Hobbit and The Lord of the Rings*

The late J.R.R. Tolkien was a British citizen, professor and author who coined the term "Hobbit" to refer to the race of fictional three-foot tall, human-like creatures who are the central characters in his novels *The Hobbit: Or There and Back Again* (hereinafter *"The Hobbit"*) and *The Lord of the Rings* trilogy. Battle Dec. ¶¶ 6–7; Givan Dec., Exh. 10 ¶¶ 4, 11. *The Hobbit* was first published in the United States in 1938, while *The Lord of the Rings*, the sequel to *The Hobbit* comprising three individual volumes, was first published in the United States in 1954, 1955, and 1956. Battle Dec. ¶¶ 3–4. The Hobbit characters feature prominently in both books. Since their publication, both *The Hobbit* and *The Lord of the Rings* have been in print continuously. *Id.* ¶ 5. In 1965 Ballantine Books published in the United States authorized paperback versions of *The Hobbit*, which sold 6.2 million copies between 1967 and 1978, and *The*

*Lord of the Rings*, which sold 12.4 million copies during the same time period. Givan Dec., Exh. 13 ¶¶ 12–13; Exh. 10 ¶¶ 10, 17. During the 1960s and 1970s, Tolkien's books garnered national media attention, with various newspaper articles appearing in *The New York Times*. Givan Dec. ¶¶ 117–119, Exhs. 35–37 ("The Prevalence of Hobbits", January 15, 1967; "Good Lord, It's Frodo Baggins," June 14, 1970; "Behind the Best Sellers: J.R.R. Tolkien," October 2, 1977). When George Wozniak opened his travel agency in Minnesota in 1976, the Concise Oxford Dictionary defined the word "Hobbit" as: "one of an imaginary race of half-sized persons in stories by J.R.R. Tolkien (E. writer d.1973 and said by him to mean hole-dweller)." Givan Dec., Exh. 10 ¶ 19. Since their initial publication and re-release as paperbacks, both *The Hobbit* and *The Lord of the Rings* have remained commercially viable. Hansen Dec. ¶ 3. Between 1980 and 2007, Houghton Mifflin sold 4.9 million authorized copies of *The Hobbit* and 13.1 million authorized copies of *The Lord of the Rings*. *Id.*

J.R.R. Tolkien's novels have been extended to a variety of entertainment and merchandising outlets, beginning in at least the early 1970s. In conjunction with its license to publish the 1965 paperback versions of *The Hobbit* and *The Lord of the Rings*, Ballantine Books also obtained the right to market related paper merchandise such as calendars, cards and posters. Givan Dec., Exh. 13 ¶ 10. Ballantine Books obtained these rights from J.R.R. Tolkien's British publisher. Givan Dec., Exh. 10 ¶ 10, Exh. 13 ¶ 10. Beginning in 1972, Ballantine Books published the first authorized series of J.R.R. Tolkien calendars which included a 1976 wall calendar and a 1978 desk calendar both entitled "The Hobbit." Givan Dec., Exhs. 13 ¶ 14, 26D, 26AA.

In 1969, United Artists Corporation acquired the rights to produce motion pictures, stage and television programs, and merchandise based on J.R.R. Tolkien's literary works. Bendich Dec. ¶ 4. United Artists acquired these rights from J.R.R. Tolkien's British publisher and executor, which in turn had acquired the rights directly from J.R.R. Tolkien himself. *Id.* By 1977 United Artists had received "hundreds" of requests for permission to use marks related to J.R.R. Tolkien's works, including the "Hobbit" mark. Givan Dec., Exh. 14 ¶ 8. These requests were for various products including board games, bookmarks, ceramic sculptures, chess sets, posters, jewelry, leather goods, linens, maps, painting sets, pictures of fine art, puppets, restaurant services, stationery, and t-shirts. *Id.* ¶ 9. United Artists refused each of these licensing requests, preferring to coordinate merchandising of Tolkien goods with the release of a motion picture film. *Id.* ¶ 10.

No film was released until November 1977, following plaintiff Tolkien Enterprises's acquisition of the entertainment and merchandising rights from United Artists in December 1976. Bendich Dec. ¶¶ 4, 6. Directed by Jules Bass and Arthur Rankin, Jr., the 1977 animated television film of *The Hobbit* was nationally publicized in 1976 and 1977 prior to its release. *Id.* ¶ 6. In connection with the animated film, Hobbit merchandise—including Hobbit posters, a coffee table book, records, puzzles and a board game—was nationally advertised and sold. Givan Dec., Exhs. 26G–H, 26J. Although the television film was unauthorized when it began production, the Tolkien Estate and Tolkien Enterprises threatened legal action, and the film and its related merchandise became authorized through a series of settlement agreements. Bendich Dec. ¶ 7. A sequel to the 1977 film, *The Return of the King—A Story of the Hobbits,* was released on television in May 1980, and was also eventually authorized by settlement agreement. *Id.* Both the 1977 and 1980 television films remain commercially available for home viewing today. *Id.* ¶¶ 6, 13.

In the mid–1970s, plaintiff Tolkien Enterprises produced an animated theatrical film of *The Lord of the Rings,* directed by Ralph Bakshi. *Id.* ¶ 16. Released in movie theaters in 1978, the film was distributed and advertised by United Artists and was announced as the largest advertising campaign in United Artists' history. *Id.* ¶ 17. In addition to full-page ads in newspapers of nineteen major U.S. cities, the advertising campaign included theater trailers, full-page ads in major magazines, a 1–hour network television special on J.R.R. Tolkien, and a float in the Macy's Thanksgiving Day Parade. *Id.* Tolkien also engaged in various merchandising efforts in connection with the film including board games, puzzles, and figurines related to the Hobbit characters. Givan Dec., Exhs. 26K, 56, 26O. The Bakshi film garnered a Golden Globe nomination and has grossed approximately $30 million in the United States since its release. Battle Dec. ¶ 13.

More recently, New Line Cinema became Tolkien Enterprises's licensee to create films and related merchandise based on Tolkien's literary works. Bendich Dec. ¶ 23. Between 2001 and 2003 New Line Cinema released three separate films directed by Peter Jackson, each representing one installment of *The Lord of the Rings* trilogy—*The Fellowship of the Ring, The Two Towers,* and *The Return of the King.* Battle Dec. ¶ 40. The final installment of the trilogy won the 2003 Academy Award for Best Picture. *Id.* ¶ 41. All three individually rank among the top 20 highest-grossing films of all time in the United States and they have grossed more than $1 billion domestically. *Id.* Like the films that came before them, the New Line

Cinema films were accompanied by a merchandising campaign for items such as toys, collectibles, interactive games, stationery, books, and apparel. Imhoff Dec. ¶ 2. Various items have been sold under the Hobbit mark. Drotos Dec. ¶¶ 21, 23, 24. New Line Cinema recently announced its intention to produce and distribute two more motion pictures based on J.R.R. Tolkien's *The Hobbit. Id.* ¶ 9.

Tolkien Enterprises and its licensees use the Internet as a marketing channel to advertise, promote and sell Tolkien related products and entertainment. New Line Cinema established an authorized website, *www.lordoftherings.net*, in May 1999 to generate and maintain interest in *The Lord of the Rings* films. Drotos Dec. ¶ 14. Since at least September 2001, this website has been linked to New Line Cinema's online shop at *shop.newline.com* where visitors can purchase products, including Hobbit products, related to the films. *Id.* ¶ 15. Licensed goods are also available online through licensee's websites (e.g., *www.thehobbitgame.com*) and third-party Internet retailers' sites (e.g., *www. amazon.com*). *Id.* ¶¶ 16–39. Tolkien Enterprises has acquired various Internet domain names including *www.thehobbit.com* which it acquired in July 1998 and is currently automatically re-routed to *www. tolkien-ent.com. Id.* ¶ 12. The website *www.tolkienent.com*, among other things, provides information regarding Tolkien Enterprises's rights relating to the Tolkien works, contact information for licensing inquires, and information regarding selected current licensees and their websites. *Id.* Tolkien Enterprises has also acquired forty additional domain names that incorporate the Hobbit mark. *Id.* ¶ 42.

In addition to the marketing of movies and merchandise, Tolkien Enterprises or its licensees have also, from time to time, marketed travel-related goods and services. Since 1982, Tolkien Enterprises has licensed a nature trail in the redwood forests of Humboldt County, California which recreates the journey of *The Hobbit* and is advertised on the Internet. Givan Dec., Exhs. 18 at 162:16–165:8, 18H. In connection with the recent 2001–2003 film trilogy, Tolkien Enterprises's licensee New Line Cinema entered into a two-year agreement with Air New Zealand in 2002 to market the carrier as "Airline to Middle-earth." Battle Dec. ¶ 43; Imhoff Dec. ¶¶ 10–12. New Line Cinema added a travel category to its online shop, allowing Air New Zealand to offer vacation packages to website visitors, and also offered official movie merchandise and movie premieres as prizes to stimulate travel on Air New Zealand. Imhoff Dec. ¶¶ 10–11. The airline also painted depictions of the Hobbit characters on its jets and distributed miniature versions of these painted jets as collectibles. *Id.* In the future, Tolkien Enterprises expects that New Line Cinema will engage in similar travel promotions in connection with the anticipated release of *The Hobbit* movie. *Id.* ¶ 44. Finally, Tolkien Enterprises licensed Kevin Wallace Limited to produce a stage musical based on *The Lord of the Rings* which premiered in Toronto, Canada in March 2006 and in the West End in London in June 2007. Battle Dec. ¶ 45. In connection with the sale of musical tickets, Kevin Wallace Limited engaged in travel promotions on its website and with Virgin Atlantic and Jet Airways. *Id.* ¶¶ 46–49. To promote the Kevin Wallace stage musical, passengers on Virgin Atlantic flights into the United Kingdom received a travel pack containing flight socks tagged with the slogan "May the hair on you toes never fall out," a quote from The Hobbit book. *Id.* ¶ 48.

Tolkien Enterprises has over one hundred registered trademarks for various Tolkien-related marks, including five current and five expired United States registrations for Hobbit marks. One registra-

tion dated April 1977 is incontestable. The registrations for Hobbit marks are for various products including, "apparatus sold as a unit for playing a parlor game"; "toy action figures and accessories therefor"; "figurines"; "printed matter, namely posters, art prints, postcards"; "computer game software"; and "downloadable video game software." Barrett Dec., Exh. 1. None of the trademark registrations are for use of the Hobbit mark in connection with travel goods and services.

Tolkien Enterprises has engaged in various trademark enforcement efforts. After acquiring its rights in late 1976, Tolkien Enterprises took action against a number of unauthorized users. Many unauthorized users, after receiving cease-and-desist letters informing them of Tolkien Enterprises's rights, entered into license agreements or simply discontinued their unauthorized use. *See e.g.*, Bendich Dec. ¶¶ 26, 32–40; Exhs. 21–28. At times, Tolkien's enforcement efforts have required significant litigation activity. In 1982, Tolkien Enterprises agreed to dismiss and settled a case following the court's decisions on summary judgment. *See Superior Models, Inc. v. Tolkien Enterprises*, 1981 WL 40556, 211 U.S.P.Q. 876, (D.Del. Aug.14, 1981). The plaintiff Superior Models, Inc., a manufacturer and marketer of miniature metal figurines, agreed to take a license from Tolkien Enterprises and pay royalties in exchange for certain ancillary rights provided by Tolkien Enterprises. Bendich Dec. ¶¶ 41–42. Another enforcement effort resulting in litigation occurred in the 1990s and involved AT & T's plan to use the term Hobbit to describe one of its microprocessors. Tolkien Enterprises disputed AT & T's planned use of the mark, communications between counsel led to a trademark opposition, and litigation ensued in 1995 when Tolkien Enterprises filed a complaint for trademark infringement against AT & T in the Northern District of Illinois. Ultimately, AT &

T recognized Tolkien Enterprises's rights in the Hobbit mark, assigned its trademark registrations to Tolkien Enterprises, and ceased using the mark. *Id.* ¶¶ 44–46.

## II. *Wozniak's Hobbit Travel*

George Wozniak, owner and founder of defendant Wozniak Travel, opened the Minnesota-based travel agency Hobbit Travel in 1976. Wozniak Dec. ¶ 3. When Wozniak opened Hobbit Travel in 1976 he did so in partnership with the Chicago-based travel agency Hobbit International, which also did business under the name Hobbit Travel. Wozniak Dec., Exh. M, 44:4–15. In business since 1969, Hobbit International was founded by a group of college professors who picked the name Hobbit International because they thought their students would be familiar and identify with the name having read the J.R.R. Tolkien books. Abramson Supp. Dec., Exh. A, 233:15–22; Givan Dec., Exh. 33, 18:9–19:21. When Wozniak was a college student, the Chicago-based Hobbit International employed him as a representative on Minnesota campuses, promoting and selling its vacation packages in 1974 and 1975. In the summer of 1975, Wozniak moved to Chicago to work for Hobbit International full-time. Wozniak Dec., Exh. M, 29:17–30:1. While he was working in Chicago, Wozniak attended a children's production of a play based on *The Hobbit*, and he started but did not finish reading the book. Givan Dec., Exh. 31, 209:18–212:21.

When Wozniak returned to Minnesota in 1976 to open his own travel agency, he agreed by handshake to share the profits from his new office 50/50 with Hobbit International. *Id.*, 44:4–15. The new Minnesota office initially operated as "Wozniak's Hobbit Travel," but the travel agency soon shortened its name to "Hobbit Travel" because, according to Wozniak,

customers and agents had difficulty spelling and remembering the name Wozniak. *Id.*, 54:11–20, 208:2–8. Wozniak Travel and Hobbit International ended their profit-sharing arrangement by handshake at an unknown date in the 1970s, possibly when Wozniak Travel incorporated in 1977. Abramson Dec., Exh. A, 133:12–23, 244:24–247:13. Wozniak Travel and Hobbit International maintained business ties after they severed the profit-sharing agreement. *Id.*, 125:18–126:2. For some time in the 1990s, Wozniak Travel paid for advertisements in the Chicago area that included Hobbit International's contact information. *Id.*, 169:20–170:19, 171:11–173:17. This advertising arrangement arose under Wozniak Travel's wholesale arm "Trilogy Tours," which is distinct from the retail arm operating as "Hobbit Travel." Wozniak Dec., Exh. M, 59:6–60:13. Under the advertising agreement, Wozniak Travel bought advertising for local travel agencies, such as Hobbit International, which then sold airline tickets purchased wholesale from Wozniak Travel. *Id.* Hobbit International later went out of business in 1998. *Id.*, 35:14–21.

In addition to the Chicago-based Hobbit International, Wozniak Travel also does business with a Wisconsin-based travel agency called Friedman's Hobbit Travel. Wozniak Supp. Dec., Exh. M, 362:1–11. In 1982, David Friedman, a former campus representative for Wozniak Travel, informed Wozniak that he planned to open his own travel agency in La Crosse, Wisconsin. Givan Dec., Exh. 4, 44:1–20. Wozniak and the other owners of Wozniak Travel gave Friedman information about the travel business, offered advice, answered "a lot of questions" and helped him open the La Crosse, Wisconsin travel agency. Wozniak Supp. Dec., Exh. M, 359:1–18. Wozniak Travel contemplated a franchise relationship with Friedman, but ultimately decided that such an arrangement was not financially realistic. Woz-

niak Travel took no ownership interest in Friedman's travel agency, and Wozniak told Friedman, "Dave, good luck and I hope everything goes well." *Id.*, 359:13–360:12.

Today, Friedman's Hobbit Travel is a three-employee travel agency serving La Crosse, Wisconsin, a city of 50,000, and the surrounding area, which includes La Crescent, Minnesota, directly across the Mississippi River from La Crosse. Friedman Dec. ¶ 3; Abramson Supp. Dec., Exh. B, 35:6–7. Although Friedman's Hobbit Travel has registered an internet domain name, it has never established an internet website and limits its print advertisements to the *La Crosse Tribune* and the newspaper of the University of Wisconsin at La Crosse. Abramson Supp. Dec., Exh. B, 53:6–8, 68:5–12, 80:20–81:20. Friedman believes that he has the continuing right to use the name "Friedman's Hobbit Travel" in connection with his travel agency, as he has done since 1982. Givan Dec., Exh. 4, 40:9–12. Defendant Wozniak agrees that Friedman has that right. Givan Dec., Exh. 3, 496:14–17. Wozniak Travel exercises no control over how Friedman uses the Hobbit Travel name. Givan Dec., Exh. 4, 40:17–41:4; Exh. 3, 362:12–15. Wozniak Travel sells wholesale travel services to Friedman's Hobbit Travel and maintains businesses ties with the Wisconsin travel agency, but does not otherwise monitor the agency's business operations. Givan Dec., Exh. 4, 47:10–48:10, 50:5–25; Wozniak Supp. Dec., Exh. M 362:1–11.

Aside from use of the name Hobbit, defendant Wozniak Travel's storefront signs and logos do not invoke names, characters, places or images from the Tolkien works. Wozniak Dec., Exh. F. A sampling of hundreds of Hobbit Travel's advertisements, brochures, posters, invoices, customers confirmations and letterhead dating back to at least the early 1980s

likewise suggests no connections to names, characters, places or images from the Tolkien works. Wozniak Dec., Exhs. E–G. Since 1976, Hobbit Travel's logo has featured the travel agency's name and a drawing of a 727 jet. *Id.* At times, Wozniak Travel has also used the slogan "The Low Fare Company" paired with the name Hobbit Travel. *Id.* Both the 727 jet and the slogan "The Low Fare Company" have been featured on the Hobbit Travel website since its launch. Wozniak Dec., Exh. K.

Wozniak Travel has adopted terms related to J.R.R. Tolkien's works for various components of its business. The company's 401(k) plan is named the "Tolkien Trust." Givan Dec., Exh. 31, 79:6–83:2. In addition to the retail business of Hobbit Travel at issue here, Wozniak Travel also runs "Trilogy Tours" as its wholesale company selling travel packages to other travel agencies. Wozniak Dec., Exh. M, 83:1–22. Trilogy Tours was originally named and run by Hobbit International, but Wozniak Travel took over the business, it appears, in the 1980s. *Id.* In 2006, Wozniak Travel briefly named its new computer servers Bilbo, Gandalf and Frodo, which are all major characters in J.R.R. Tolkien's works. Wozniak Dec., Exh. 25, 44:9–15. Upon connecting the servers to the company network, Wozniak Travel changed the server names to MAINPDC, MAINANTIVIRUS and MAINHCD. *Id.*, 46:15–25.

Since its inception thirty years ago, Wozniak Travel has grown steadily to become the largest travel agency in Minnesota. Wozniak Dec., Exh. M, 328:3–8. By 1984, the business included three retail offices and over 50 employees. Abramson Dec., Exh. C 1. In the decade before this action was filed, Wozniak Travel booked trips for 2.5 million passengers, approximately 300,000 of whom were neither Minnesota nor Wisconsin residents, and maintained a mailing list with more than 400,000 recipients, over 100,000 of whom are from outside Minnesota. Ewald Dec. ¶¶ 2–3, Exh. A. All told, Wozniak Travel has made over $1 billion in travel sales in its thirty-year history. Wozniak Dec., Exh. D; Exh. M, 328:3–8.

Wozniak Travel has spent more than $10 million on promotions to generate this business. Wozniak Dec. ¶ 6. Beginning in 1977, advertisements for Hobbit Travel appeared in leading regional papers including the *Minneapolis Star Tribune* and *St. Paul Pioneer Press.* Wozniak Dec. ¶ 8. Wozniak Travel increased its advertising expenditures from a few thousand dollars annually in the late 1970s to over one million dollars in 2000. Wozniak Dec. ¶ 6, Exhs. D1–27. Wozniak also personally promoted his business through television and radio appearances along with newspaper interviews. Beginning in the late 1970s, Wozniak appeared on local television shows to discuss travel. Wozniak Dec., Exh. M, 288:7–24. Such appearances increased overtime as Wozniak, as a representative of Hobbit Travel, reached national audiences in two Oprah Winfrey Show appearances in 1990 and 1992 and again in at least three national news broadcasts on the Today Show, World News Tonight, and the CBS Evening News in the late 1990s and early 2000s. *Id.* Wozniak and his travel agency Hobbit Travel have also appeared in radio broadcasts and hundreds of newspaper articles since the 1980s. Wozniak Dec ¶ 6; Abramson Dec., Exhs. C1–338. In promoting Hobbit Travel, Wozniak claims that he has never discussed J.R.R. Tolkien or the films related to his works. Wozniak Dec. ¶ 10. Wozniak does not recall having been questioned by an interviewer, caller or audience member on television or radio about a connection between Hobbit Travel and J.R.R. Tolkien. *Id.*

Wozniak Travel first established an on-line presence in 1996 with the registration of the domain name *www.hobbittravel.com*. Wozniak Dec., Exh. N, Ans. to Int. No. 4, 11. Though exact records are unavailable, Wozniak Travel's website was activated by at least 2000. *Id.* Between 2003–2005, Wozniak Travel expanded the scope of its internet presence by offering direct internet sales and purchasing more domain names, such as *www.hobbitcruise.com* and *www. hobbitdeals.com*. Given Dec., Exh. 23, 36:19–37:1, 93:11–95:5. Earliest available statistics show that Wozniak Travel's website received 400,000 views in 2002 and approximately 1 million views per year thereafter. Scherbel Dec., Exhs. A, B. More than 25 percent of these views are from computer users in different time zones than Wozniak Travel's Minnesota offices. *Id.* In 2005, less than 1% of Wozniak Travel's retail sales occurred online; by 2008, online purchases remained less than 10% of Wozniak Travel's retail sales. Ewald Dec., Exh. A.

III. *The Present Controversy*

Tolkien Enterprises claims that it learned of Wozniak Travel in November 2003 due to Wozniak Travel's growing internet presence. Given Dec., Exh. 24, 36:13–16. In 2004, New Line Cinema sent Wozniak Travel a cease-and-desist letter requesting that Wozniak Travel not operate its business as Hobbit Travel. *Id.,* Exh. 32, 504:7–19. Wozniak Travel continued to operate as Hobbit Travel, and in 2005 filed an application to register Hobbit Travel as a mark with the United States Patent and Trademark Office ("USPTO"). *Id.* Tolkien Enterprises submitted a Letter of Protest against Wozniak Travel's application and filed this lawsuit in September 2006. Barrett Dec. ¶ 40. During the course of this litigation, Wozniak Travel withdrew its UPSTO application with prejudice in 2007.

Tolkien Enterprises initiated the present suit alleging five causes of action. Under federal law, Tolkien Enterprises alleged (1) trademark infringement, 15 U.S.C. § 1114, (2) unfair competition and false designation of origin, 15 U.S.C. § 1125(a), and (3) trademark dilution, 15 U.S.C. § 1125(c). Complaint ¶¶ 47–62. Tolkien Enterprises brought California state law claims of (4) trademark dilution, Cal. Bus. & Prof.Code § 14330, and (5) unfair competition, Cal. Bus. & Prof.Code § 17200 *et seq. Id.,* ¶¶ 63–74. Tolkien Enterprises pled for monetary and injunctive relief, seeking treble damages based on Wozniak Travel's profits made while using the name Hobbit and a court order barring Wozniak Travel's future use of the name Hobbit Travel. *Id.* Wozniak Travel counterclaimed with one cause of action, seeking declaratory relief that it may continue to operate as Hobbit Travel. Def.'s Answer.

In the motions now before the court, Wozniak Travel moves for summary judgment on five separate grounds, arguing that all of Tolkien Enterprises's claims are barred by laches, the state law unfair competition claim is barred by the statute of limitations, the infringement claims fail because there is no likelihood of confusion, and the dilution claims fail because the Hobbit mark was not famous in 1976 when Wozniak Travel opened its travel agency and alternatively, because there is no likelihood of dilution. Tolkien Enterprises opposes Wozniak Travel's motion and in addition, has filed its own motion for partial summary judgment. Tolkien Enterprises argues that Wozniak Travel, by granting naked licenses to both the Chicago-based Hobbit International and the Wisconsin-based Friedman's Hobbit Travel, has abandoned any rights to the Hobbit mark and, as a result, is precluded as a matter of law from demonstrating the prejudice element of a laches defense.

*LEGAL STANDARD*

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed.R.Civ.P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters started therein." Fed.R.Civ.P. 56(e). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.; see also Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir.1994). The court may not make credibility determinations, *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505, and inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Masson v. New Yorker Magazine*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

The fact-dependent nature of trademark law often does not allow for resolution on summary judgment. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir.2002). However, summary judgment is still appropriate in trademark suits when no dispute remains as to genuine issues of material fact. *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102 (9th Cir. 2006). Notably, a "district court may properly grant summary judgement on the basis of laches." *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 831 (9th Cir.1991); *see also Jarrow*, 304 F.3d at 833–834 (affirming grant of summary judgment to defendant on the basis of laches, holding that district court, under de novo standard of review, did not inappropriately resolve disputed material facts in reaching its decision, and holding that district court, under either abuse of discretion or clear error standard of review, did not err in its application and balancing of the laches factors).

*DISCUSSION*

 Plaintiff and defendant have filed cross-motions for summary judgment on the issue of whether the affirmative defense of laches bars relief in this case. "Laches is an equitable time limitation on a party's right to bring suit, . . . resting on the maxim that 'one who seeks the help of a court of equity must not sleep on his rights.'" *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir.2002). As the party asserting laches, defendant Wozniak Travel must show that "(1) [the plaintiff's] delay in filing suit was

unreasonable, and (2)[it] would suffer prejudice caused by the delay if the suit were to continue." *Id.* at 838. The Ninth Circuit has directed courts to weigh a host factors in deciding whether plaintiff's delay was unreasonable. *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n,* 465 F.3d 1102, 1108 (9th Cir. 2006); *E–Systems, Inc. v. Monitek, Inc.,* 720 F.2d 604, 607 (9th Cir.1983). These factors include: "(1) strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by the junior user because of senior user's delay." *E–Systems,* 720 F.2d at 607 (*quoting Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 293 F.Supp. 892, 917 (S.D.N.Y.1968), *affirmed and modified,* 433 F.2d 686, 703–704 (2d Cir.1970)). Ultimately, as an equitable doctrine, the denial of relief on the basis of laches is not determined by simple rules of thumb or rigid legal rules. *Carl Zeiss,* 293 F.Supp. at 917. Rather, it is determined by " 'a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties.' " *Id.; see also* 6 McCarthy on Trademarks and Unfair Competition § 31:22 (4th ed.2007) (hereinafter "McCarthy").

■■ As a threshold matter, the court notes that laches is an available defense to each of the claims and relief sought in this case. Plaintiff asserts federal causes of action for trademark infringement (Lanham Act § 32,15 U.S.C. § 1114(1)); unfair competition and false designation of origin (Lanham Act § 43(a), 15 U.S.C. § 1125(a)); and trademark dilution (Lanham Act § 43(c), 15 U.S.C. § 1125(c)). Plaintiff also asserts state causes of action for trademark dilution (Cal. Bus. & Prof.Code § 14330) and unfair competition (Cal. Bus. & Prof Code § 17200). Plaintiff seeks

both monetary and injunctive relief. "It is well established that laches is a valid defense to [federal] Lanham Act claims." *Jarrow Formulas,* 304 F.3d at 835 (affirming application of laches to federal claim for false advertising under Lanham Act § 43(a)(1)(B)); *see also Tillamook,* 465 F.3d at 1108–11 (affirming application of laches to federal trademark infringement claim); 15 U.S.C. §§ 1125(c)(1), (c)(5) (stating explicitly that injunctive and monetary relief for claims of trademark dilution are "subject to the principles of equity"). Laches is also an available defense to plaintiff's state law dilution and unfair competition claims. *Jarrow Formulas,* 304 F.3d at 842 (affirming application of laches to California state law claim for unfair competition); *Prudential Ins. Co. of America v. Gibraltar Financial Corp. of Calif.,* 694 F.2d 1150, 1155 (9th Cir.1982) (affirming application of laches to California state law claims for dilution and unfair competition). Finally, laches is a bar to both monetary and injunctive relief. *See, e.g., Jarrow Formulas,* 304 F.3d at 840; *Prudential Ins.,* 694 F.2d at 1152.

### I. *Unreasonable Delay*

■ "A determination of whether a party exercised unreasonable delay in filing suit consists of two steps." *Jarrow Formulas,* 304 F.3d at 838. "First, [a court] assess[es] the length of delay, which is measured from the time the plaintiff knew or should have known about its potential cause of action." *Id.* Second, once a court determines the length of delay, a court must "decide whether the plaintiff's delay was unreasonable." *Id.* The court will address each of these two prongs below.

### A. *Length of Delay*

■■ The "knew or should have known" standard allows a laches defense to be based on either actual or constructive

knowledge. *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 980–981 (9th Cir.2006). Constructive knowledge is judged from an objective reasonable person standard, and therefore, a trademark owner is chargeable with the information it might have received had due inquiry been made. *Id.* (plaintiff "knew, or should *reasonably* have known" of defendant's activity) (emphasis added); *see also* 6 McCarthy § 31:38. The constructive knowledge standard imposes on a trademark owner the duty to police its rights against potential infringers. *See Grupo Gigante Sa De CV v. Dallo & Co. Inc.*, 391 F.3d 1088, 1102 (9th Cir.2004) ("[c]ompanies expecting judicial enforcement of their marks must conduct an *effective* policing effort"); *E–Systems*, 720 F.2d at 607 ("[p]laintiff ought to have discovered defendant's use sooner had it been diligently seeking to enforce its mark").

Plaintiff invites the court to adopt a more stringent standard that constructive notice may be imputed only when it is "inconceivable" that a plaintiff was unaware of defendant's potential infringement. Plaintiff's cited authority, however, does not support plaintiff's position. Plaintiff cites to a recent case from the District of Oregon in which the court commented that "[t]o prove that a plaintiff knew or should have known of the defendant's allegedly wrongful activity, the defendant 'must make a showing that it would have been *inconceivable* that [the plaintiff] would have been unaware' of those activities." *adidas Am., Inc. v. Payless Shoesource, Inc.*, 529 F.Supp.2d 1215, 1251 (D.Or. Dec.21, 2007) (emphasis added). For this proposition, the court in *adidas* cited to *Official Airline Guides, Inc. v. Churchfield Publications, Inc.*, 756 F.Supp. 1393, 1404 (D.Or.1990), which in turn cited to *Georgia–Pacific v. Great Plains Bag Co.*, 614 F.2d 757, 759 (Cust. & Pat.App.1980), which in turn cited to *Loma Linda Food Co. v. Thomson & Taylor*

*Spice Co.*, 47 C.C.P.A. 1071, 279 F.2d 522, 525 (Cust. & Pat.App.1960).

In *Loma Linda*, the court recognized that a laches defense may be based on either constructive notice or acknowledge knowledge. *Id.* In the context of discussing how actual knowledge may be established, the court in *Loma Linda* commented that when direct evidence is unavailable, actual knowledge may nevertheless be found from circumstantial evidence showing "a state of facts in which it is *inconceivable* that the party charged with laches in a trademark case could have been unaware of the opposing party's use of the mark." *Id.* (citing *Procter & Gamble Co. v. J.L. Prescott Co.*, 102 F.2d 773, 779–80 (3d Cir.1939)) (emphasis added). Plaintiff's citation to *adidas* and implicitly, to the cases preceding *adidas*, does not support plaintiff's position because the "inconceivable" standard, as discussed by the court in *Loma Linda*, was used in connection with establishing actual knowledge and was not used in connection with establishing constructive knowledge. Moreover, the Ninth Circuit has never adopted a more stringent standard requiring a showing that plaintiff's unawareness is "inconceivable." While facts tending to show that it is "inconceivable" that plaintiff was unaware of defendant's activity are *sufficient* to establish constructive notice, they are not *necessary* given the well-established reasonable person standard.

Relying on the existence of multiple trademark and business name search reports in plaintiff's possession as well as on defendant's open and continuous use of the Hobbit Travel name, defendant argues that plaintiff should have known of defendant's potentially infringing use long before it commenced this action in 2006. The court agrees. As plaintiffs point out, the court is mindful that although a trademark owner has a duty to police its rights

against potential infringers, it is " 'not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of [its] shotgun instantly upon spotting a possible infringer.' " *adidas America, Inc. v. Kmart Corp.*, 2006 WL 2044857, at *8 (D.Or. June 15, 2006) (citation omitted). In this case, however, plaintiff is not a trademark owner with few resources available to conduct a policing effort and defendant's use of the Hobbit Travel mark has not been secretive, negligible, or sporadic.

In 1977, shortly after it acquired from United Artists the entertainment and merchandising rights to J.R.R. Tolkien's novels, plaintiff retained outside counsel to advise and assist it in trademark matters. Abramson Dec., Exh. J. at 68:9–72:24. On more than one occasion, plaintiff's trademark counsel purposefully collected or otherwise received search reports whose precise purpose was to alert the recipient to unauthorized uses. A July 1977 report, based on searches of trademark records at the U.S. Patent and Trademark Office and business names listed in trade directories and in major city telephone directories, showed the Chicago-based Hobbit International, but did not include information about plaintiff's Minnesota-based Hobbit Travel. Abramson Dec., Exh. O1. Likewise, another search report dated May 1977 and provided to outside counsel in the early 1980s in connection with litigation to enjoin Superior Models, Inc. from selling miniature figurines based on the Tolkien characters, also revealed Hobbit International, but not Hobbit Travel. Abramson Dec., Exh. O3A.

Although neither the July 1977 nor the May 1977 search reports disclosed plaintiff's Hobbit Travel, a subsequent search report ordered by plaintiff in September 1988—exactly eighteen years before plaintiff commenced this action in September 2006—identified defendant Wozniak Travel

of St. Paul, Minnesota as the owner of Hobbit Travel. The 1988 report also disclosed Wozniak Travel's assumed name registration with the Minnesota Secretary of State. Abramson Dec., Exh. O4.

After 1988, Tolkien Enterprises was again informed of defendant's Hobbit Travel. In 1992—fourteen years before the complaint was filed in this action—Tolkien Enterprises and AT & T engaged in a series of communications after AT & T announced plans to market a microprocessor under the Hobbit mark. In a letter to plaintiff's outside counsel, AT & T noted that it had discovered various uses of the Hobbit mark, including uses by travel agencies. Abramson Dec., Exh. O5. AT & T provided to Tolkien Enterprises three separate reports, each based on a search of a different proprietary database of trademark registrations and business names. Abramson Dec., Exhs. O6–O8. Each of these reports disclosed plaintiff's Hobbit Travel and its Minnesota location. *Id.* (Exh. O6 at 712; Exh. O7 at 15294; Exh. O8 at 15379).

In April 2000—six years before commencing this action—Tolkien Enterprises's counsel ordered a search report that, like the reports in 1988 and 1992, disclosed defendant's Hobbit Travel. Abramson Dec., Exh. O9 at 45115, 45117. This 2000 report disclosed Hobbit Travel's Minnesota address, telephone number, approximate sales, number of employees, principal officers, *id.*, as well as Hobbit Travel's website domain name hobbittravel.com, *id.* at 45223. The report also included a 1995 newspaper article reporting that plaintiff's Hobbit Travel was, at that time, a $40 million travel agency. *Id.* at 45014.

The 1988, 1992, and 2000 search reports identifying defendant's Hobbit Travel were in plaintiff's possession, and yet, plaintiff conducted no further inquiry or investigation other than visiting defendant's *hobbit-*

*travel.com* website and printing out a screen-shot of the webpage on the same day it received the 2000 search report. *Id.* at 45224. Moreover, plaintiff took no action against defendant until plaintiff's licensee New Line Cinema sent a cease-and-desist letter in 2004. Givan Dec., Exh. 32, 504: 7–19. Plaintiff's own assertion that it has policed its marks, in part relying on search reports, is difficult to reconcile with its simultaneous claim of ignorance of the contents of those reports.

Had plaintiff conducted further investigation, as a reasonably prudent person would have done when confronted with successive search reports disclosing potentially infringing uses, it would have discovered that defendant had been operating a successful travel agency under the Hobbit mark openly and continuously for many years. Since its inception in 1976, defendant has sold approximately $1 billion in travel services under the name Hobbit Travel and has spent more than $10 million advertising the Hobbit Travel name. Wozniak Dec. ¶ 6; Exhs. D1–D27. Advertising has been continuous and widespread, covering a variety of regional and national media outlets including newspapers, magazines, television, and radio. Abramson Dec., Exhs. C1–338; Wozniak Dec. ¶ 8. By 1984—four years before plaintiff received the first search report disclosing defendant's Hobbit Travel—the travel company had three retail offices and over 50 employees. Abramson Dec., Exh. C1. By the 1990s—when plaintiff received the second search report—Hobbit Travel had received media coverage on national television in two Oprah Winfrey Show appearances in addition to coverage in hundreds of newspaper articles. Wozniak Dec., Exh. M, 288:7–24; Abramson Dec., Exhs. C1–338. By the year 2000—when plaintiff received the third search report—Hobbit Travel had already been operating successfully for almost twenty-five years and was generating tens of millions of dollars

in revenue. *Id.* ¶ 6. In the decade before this action was filed, Hobbit travel booked trips for 2.5 million passengers and maintained a mailing list of more than 400,000 recipients. Ewald Dec. ¶¶ 2–3, Exh. A.

Plaintiff does not dispute the existence and content of the 1988, 1992, and 2000 search reports, nor does plaintiff dispute defendant's successful, open and continuous operation. Plaintiff insists, however, that summary judgment cannot be granted to defendant because its outside trademark counsel has attested that she did not know about Hobbit Travel until November 2003 when she reviewed a search report ordered from an Internet domain name watch service. Givan Dec., Exh. 24 at 36:13–16; Givan Dec., Exh. 19 at 55:22–56:1.

While this testimony is sufficient to create a disputed issue of fact as to plaintiff's *actual* knowledge, it is insufficient to create a disputed issue of fact as to plaintiff's *constructive* knowledge. Ninth Circuit precedent is clear that the "knew or should have known" standard is disjunctive such that a laches defense can be based on *either* constructive *or* actual knowledge. *See Glenn Miller,* 454 F.3d at 980 (rejecting argument that laches defense is "applicable only where the trademark holder 'knowingly allowed' the infringing mark to be used without objection"). Given that no genuine issues of material fact exist as to plaintiff's constructive notice, as is the case here, a disputed issue of fact as to actual knowledge is not a *material* fact that would change the outcome of the case for the purposes of summary judgment. *Id.* at 980–981 (affirming district court's finding of unreasonable delay on the basis of constructive knowledge, even though plaintiff's sworn testimony that it did not have actual knowledge until much later was sufficient to create factual issue as to actual knowledge).

Plaintiff relies on a recent case from the District of New Hampshire in which the court denied summary judgment as to laches because although plaintiff's attorney had obtained a trademark search report disclosing defendant's allegedly infringing use of plaintiff's mark, plaintiff attested that it did not have actual knowledge until several years later. *Pro Trak Int'l, Inc. v. Protracker Software, Inc.*, No. 05–CV–342–JM, 2007 WL 680766, at *2–3 (D.N.H. Mar.1, 2007). Insofar as the court in *Pro Trak* required a showing of actual knowledge, *Pro Trak* is contrary to Ninth Circuit precedent and does not help plaintiff.

 Finally, plaintiff objects to defendant's use of trademark and business search reports, arguing that they are hearsay in nature and cannot be used as evidence to show that plaintiff had notice of an actionable claim. It is a basic principle of evidence that "hearsay" is "a statement . . . offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). When a search report is offered to prove what the report asserts, i.e. that a mark has been registered and that it is in commercial use, this is classic inadmissible hearsay. *See* 2 McCarthy § 11:88. When, however, a search report is offered to prove the effect of the report on the listener, i.e. to show *notice* to the recipient, this does not fall within the definition of hearsay and is admissible evidence. *See Entous v. Viacom Int'l Inc.*, 151 F.Supp.2d 1150, 1157 n. 5 (C.D.Cal.2001) (quoting 5 Weinstein & Berger, *Weinstein's Federal Evidence*, § 801.11[5][a] (2nd. ed. 2000) ("Statements are not hearsay when they are offered not for their truth but to prove the extent of a declarant's knowledge or a recipient's notice of certain conditions.")). The court overrules plaintiff's evidentiary objections to the search reports.

In sum, the court concludes that plaintiff is charged with constructive notice of its potential causes of action against defen-dant beginning at least as early as 1988 when it received the first of multiple trademark search reports disclosing defendant's use of the name Hobbit Travel which has been open, continuous and not insignificant. The length of delay, from the time plaintiff should have known of its cause of action to the time it actually filed suit in 2006, is at least eighteen years.

### B. *Reasonableness of Delay*

 With the length of delay established as at least eighteen years, the court must next determine whether plaintiff's delay may be excused as reasonable. *Jarrow Formulas*, 304 F.3d at 838. The reasonableness of plaintiff's delay is considered in light of the time allotted by the relevant statute of limitations period. *Id.* If a plaintiff files suit within the applicable period of limitations for his claim, there is a strong presumption that laches does not bar the claims. *Id.* at 835. Conversely, if any part of the allegedly wrongful conduct occurred outside of the limitations period, courts presume that the plaintiff's claims are barred by laches. *Id.* at 836–37. In addition to comparison with the relevant statute of limitations period, courts also consider whether the plaintiff has proffered a legitimate excuse for its delay. *Id.* at 838.

The Ninth Circuit has directed courts to balance additional factors in determining whether the plaintiff's delay was unreasonable including: "(1) strength and value of the trademark rights asserted (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by the junior user because of senior user's delay." *Tillamook*, 465 F.3d at 1108 (citing *E–Systems*, 720 F.2d at 607). Some of the *E–Systems* factors overlap with other

prongs of the laches analysis and are discussed by the court in other portions of this memorandum and order. For example, the court has already discussed the second *E–Systems* factor regarding plaintiff's diligence, or lack thereof, in policing its mark as regards to defendant's use of the Hobbit mark, and the last *E–Systems* factor, harm to the junior user, is discussed below in the context of prejudice to the defendant.

 Where a federal statute like the Lanham Act does not contain an explicit statute of limitations, the Ninth Circuit presumes that Congress intended to " 'borrow' the limitations period from the most closely analogous action under state law." *Jarrow Formulas,* 304 F.3d at 836. There is some disagreement in the case law concerning the most closely analogous state law action for the federal claims at issue in this case. In *Jarrow Formulas,* a false advertising case brought under Lanham Act section 43(a) subpart (1)(B), the parties agreed, and the Ninth Circuit held, that the most analogous limitations period is California's period for fraud, which is three years. *Id.* at 838. On the other hand, the Ninth Circuit's more recent opinion in *Glenn Miller* held that all Lanham Act claims in general, including claims brought under Lanham Act section 43(a) in particular, are governed by the limitations period in California's statutes for trademark infringement and dilution, which is four years. *Glenn Miller,* 454 F.3d at 997 n. 11, 986 (holding that the statute of limitations for "all of Plaintiffs' eleven causes of action," including those brought under Lanham Act § 43(a), 15 U.S.C. § 1125(a), and Lanham Act § 43(c), 15 U.S.C. § 1125(c), is four years). Unlike the federal Lanham Act claims asserted in this action, it is clear that the statute of limitations for the California state law claims for dilution and unfair competition is four years. *See* Cal. Bus. & Prof.Code § 17208; Cal.Civ.Proc.Code § 343. For

purposes of deciding the present action, this court need not resolve whether a three year or four year limitations period is applicable to the federal claims. The length of delay in this case, at a minimum, is eighteen years, six times the statute of limitations using a three year period, and more than four times the statute of limitations using a four year period. Under either scenario, a presumption of laches applies to each of plaintiff's federal and state law claims.

Next, the court must consider the validity of reasons proffered by the plaintiff to excuse its delay and overcome the presumption of laches. Here, plaintiff proffers several excuses, each of which proves insufficient. First, Tolkien Enterprises argues that its delay was not unreasonable because it did not learn of defendant's conduct until November 2003. For the reasons previously explained, defendant's subjective ignorance and lack of curiosity prior to 2003 are not valid excuses since plaintiff is charged with constructive knowledge as of 1988.

 Second, Tolkien Enterprises argues that the doctrine of progressive encroachment justifies its delay. Under progressive encroachment, *de minimis* infringement does not obligate a trademark owner to sue. *Tillamook,* 465 F.3d at 1110. Instead, a trademark owner's obligation to sue arises when the junior user redirects or expands its business into different regions or markets bringing it into direct competition with the trademark owner. *Id., citing Grupo Gigante Sa De CV v. Dallo & Co.,* 391 F.3d 1088, 1103; *see also* 6 McCarthy § 31:20. Notably, however, "a junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment." *Tillamook,* 465 F.3d at 1110, *citing Prudential*

*Ins.,* 694 F.2d at 1154 ("growth alone does not infringement make").

In *Tillamook,* the Ninth Circuit held that the defendant meat company's move into direct supermarket sales represented normal business growth and not progressive encroachment. *Tillamook,* 465 F.3d at 1110. That the mark's senior user, a cheese company, preceded the meat company in making direct supermarket sales did not change the court's opinion that the meat company's expansion into supermarkets was a natural one. *Id.* The Ninth Circuit also stressed that the meat and cheese companies were not direct competitors, finding that the progressive encroachment argument "would be a different story" if the meat company had begun selling cheese. *Id; see also Prudential Ins.,* 694 F.2d at 1154 (finding that a progressive encroachment claim failed where an insurance company and a loan company did "not offer the same services to any substantial extent").

 In the present case, balancing the facts weighs against progressive encroachment. While Tolkien may have had no obligation to sue a small one-shop brick and mortar infringer, defendant's use of the mark was not *de minimis.* By the 1980s, it operated three locations and had over fifty employees. Abramson Decl. Ex. C1; Woz Decl. Exs. D27, F4. Its revenue increased steadily throughout the late 1970s, 1980s and 1990s, generating over $1 billion in travel sales in its thirty-year history. Hobbit Travel has been referenced in hundreds of newspaper articles as well as in radio broadcasts and national television shows. Although primarily serving the state of Minnesota, Hobbit Travel also sold travel services to residents outside that state. Had plaintiff chosen to examine Hobbit Travel, Hobbit Travel would not have been difficult to find.

Tolkien argues that Wozniak's expansion into internet sales brought Wozniak into a new national marketplace and squarely into competition with Tolkien. However, like the meat company's entrance into direct supermarket sales in *Tillamook,* Wozniak's expansion into internet sales represented natural business growth for a company with an already growing national customer base. *See Tillamook,* 465 F.3d at 1110. Given that Wozniak's move to the internet was the natural outgrowth of its existing business, the fact that Tolkien's internet sales predate Wozniak's sales is immaterial. *See id.; see also* 6 McCarthy § 31:20. Moreover, simply adopting a new form of technology as it comes into being does not constitute progressive encroachment. *See Prudential,* 694 F.2d at 1154 (expansion of television advertising not encroachment).

Progressive encroachment is also ill-suited to the facts at hand because Wozniak's growth did not bring it into direct competition with Tolkien. Even more distinct than cheese and meat (both food products) or insurance and loans (both financial services), Tolkien and Wozniak's products do not even fall within the same genre. *See Tillamook,* 465 F.3d at 1110; *Prudential Ins.,* 694 F.2d at 1154. As in *Prudential,* Tolkien and Wozniak do "not offer the same services to any substantial extent" because Tolkien's trademarks cover consumer goods and merchandise such as games, clothing, jewelry and collectibles, and Wozniak's business involves only travel services. *See Prudential Ins.,* 694 F.2d at 1154. Wozniak has always sold travel services and travel services only, and at no point in time has it sought to expand the type of services it sells, or use its mark in a significantly different way.

 The court is not unmindful that in some cases a strong mark may confer protection across product and service boundaries. *See Carnival Brand Seafood Co. v. Carnival Brands, Inc.,* 187 F.3d 1307 (11th

Cir.1999); *see also* 4 McCarthy § 24:20. In such cases, a senior user may prevent others from using its mark in product areas currently unoccupied by the senior user so long as those markets are within the natural zone of expansion for the senior user's business. *See id.; See, e.g., Jaguar Cars Ltd. v. Skandrani,* 771 F.Supp. 1178 (S.D.Fla.1991) (strength of automaker's Jaguar mark prevents competitor's use of Jaguar in naming cologne); *Rosenthal A.G. v. Ritelite, Ltd.,* 986 F.Supp. 133 (E.D.N.Y.1997) (strength of china and dinnerware maker's mark prevents competitor from using the same mark to enter religious plate and cup market). Yet, a senior user may not prevent use of a mark where the junior user enters a product market outside of the senior user's natural zone of expansion. *See, e.g., Physicians Formula Cosmetics, Inc. v. W. Cabot Cosmetics, Inc.,* 857 F.2d 80, 83 (2d Cir.1988) (senior user in soap market may not prevent use of mark by cosmetics and skin cream company where soap maker has sold exclusively bar soap for decades without moving to expand).

In the present case, the natural expansion of Tolkien's Hobbit mark did not extend to travel services at the time Wozniak opened Hobbit Travel. From 1937 when *The Hobbit* was published through the late 1970s when Wozniak began his business, Tolkien and its predecessors in interest used the Hobbit mark exclusively to market television and theatrical films and related merchandise such as calendars, posters, records, puzzles, board games, figurines, and clothing. In 1982, Tolkien licensed a nature trail that recreates the journey of *The Hobbit* in the redwood forests of Humboldt County, California. The record reflects, however, that this is plaintiff's only foray into travel-related services throughout the 1970s, 1980s and 1990s when defendant's travel agency was growing increasingly large in size.

It was not until 2002, that Tolkien entered into a two-year licensing arrangement with Air New Zealand to offer travel promotions in connection with the theatrical release of Peter Jackson's *The Lord of the Rings* trilogy. Subsequently in 2006, Tolkien arranged with Virgin Atlantic to offer travel promotions in connection with a stage musical produced by Kevin Wallace Limited. In the future, Tolkien expects to offer more travel promotions in connection with the anticipated release of New Line Cinema's *The Hobbit* movie. This late and sporadic foray into the travel services market does not aid Tolkien in countering laches. As Judge Hand explained, "The owner's rights in ... appendant markets are easily lost; they must be asserted early lest they be made the means of reaping a harvest which others have sown." *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n ("Country Smoker"),* 311 F.Supp.2d 1023, 1033 (D.Or.2004) (*quoting Dwinell–Wright Co. v. White House Milk Co.,* 132 F.2d 822, 825 (2d Cir.1943)); *see also E–Systems, Inc.,* 720 F.2d at 607 (considering competition between the senior and junior user as a laches consideration). When balanced against Wozniak's consistent, thirty-year presence in the market for travel-related services, equity gives little weight to either Tolkien's recent and sporadic interest in travel or its desire to exploit this market in the future.

The third and final excuse plaintiff proffers to justify its delay relates specifically to its federal claim for trademark dilution. In response to the U.S. Supreme Court's ruling in *Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418, 433, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003), that a federal dilution claim under 15 U.S.C. section 1125(c)(1) requires an showing of *actual,* rather than a *likelihood* of dilution, Congress passed the Trademark Dilution Revision Act ("TDRA") of 2006. The Act overruled

*Moseley* and amended the statute to make the "likelihood of dilution" standard explicit. *See* Pub.L. No. 109–312, 120 Stat. 1730, 1733; *see also,* H.R. Rep. 109–23, U.S.Code Cong. & Admin.News 2006, p. 1091 ("The *Mosely* [sic] standard creates an undue burden for trademark holders who contest diluting uses and should be revised").

Tolkien argues that its claim for dilution is based only upon a likelihood of dilution, and that because only claims for actual dilution were actionable prior to 2006, it brought its claim at the earliest possible time, shortly after Congress passed the TDRA. This argument is specious. First, Tolkien's dilution claim, as pled in the complaint, is for actual, not likelihood of dilution. Complaint ¶ 61 (alleging that Wozniak's "unauthorized use of the marks has and will *actually* dilute the distinctiveness of the HOBBIT Marks"). Second, regardless of whether the legal standard required a showing of actual or likelihood of dilution, a federal cause of action for dilution has existed since 1995 when Congress passed the Federal Trademark Dilution Act ("FTDA"). P.L. 104–98, 109 Stat. 985. Under California law, a state cause of action for dilution has existed since 1967. Cal.Code Ann. § 14330(a) (replaced by Cal. Bus. & Prof.Code § 14247). Third, before the Supreme Court's decision in *Moseley* requiring a showing of actual dilution, the Ninth Circuit applied a "likelihood of dilution" standard to claims brought under the FTDA. *Horphag Research Ltd. v. Garcia,* 475 F.3d 1029, 1036 (9th Cir.2007) (noting that *Moseley* modified the Ninth Circuit test for dilution).

In sum, the court concludes that plaintiff's delay of at least eighteen years is unreasonable. Because the length of delay far exceeds the statute of limitations period, a presumption of laches applies. This presumption is not overcome by any excuses plaintiff offers for its delay. Plaintiff brought this action in 2006 to enjoin defendant's use of the mark Hobbit Travel, thirty years after defendant had adopted that mark, and eighteen years after plaintiff received the first of multiple trademark search reports informing it of defendant's potentially unlawful use. Despite having constructive notice of defendant's use, plaintiff did nothing about it—no communications were made, no letters were written, and no lawsuits were filed against defendant or any of the other entities operating travel agencies under the Hobbit mark. The presumption of laches is not overcome by any excuses plaintiff offers for its delay, including the doctrine of progressive encroachment.

## II. *Prejudice to Defendant*

 Because " 'mere delay' by itself" is insufficient to invoke the doctrine of laches, once a court finds that plaintiff has unreasonably delayed, it must then consider whether the defendant has suffered prejudice. *NAACP v. N.A.A.C.P. Legal Defense & Education Fund, Inc.,* 753 F.2d 131, 138–139 (D.C.Cir.1985). "Courts have recognized two chief forms of prejudice in the laches context—evidentiary and expectations-based." *Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 955 (9th Cir. 2001). "Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." *Id.* Expectations-based prejudice derives from a defendant "[taking] actions or [suffering] consequences that it would not have, had the plaintiff brought suit promptly." *Id.* For example, a defendant suffers prejudice if, in reliance on plaintiff's delay, she invests labor and capital to build a trademark's goodwill and future value. *NAACP,* 753 F.2d at 138. Similarly, "a defendant may establish prejudice by showing that during the delay, it invested money to expand its business or entered

into business transactions based on his presumed rights." *Glenn Miller,* 454 F.3d at 999.

■ The economic prejudice would be severe if Wozniak Travel now lost the right to use the name Hobbit Travel. In business since 1976, Wozniak Travel has spent tens of millions of dollars on advertising in an effort to build up name recognition and goodwill. Wozniak Dec ¶ 6, Exhs. D1–27. Advertisements for Hobbit Travel appeared in leading regional papers including the *Minneapolis Star Tribune* and *St. Paul Pioneer Press* beginning in 1977. Wozniak Dec. ¶ 8. Wozniak Travel steadily increased its advertising budget over time, spending a few thousand dollars per year in the 1970s, over 100,000 dollars per year by the late 1980s, and half a million dollars per year by the mid 1990s. Wozniak Dec ¶ 6, Exhs. D1–27. Wozniak Travel's annual advertising expenditures surpassed one million dollars in 2000. Wozniak Dec ¶ 6, Exhs. D1–27. Wozniak Travel has also invested substantial time in public relations to promote Hobbit Travel. Wozniak Dec., Exh. M, p. 288:7–24. Beginning in the late 1970s, Wozniak appeared on local television shows to discuss travel. *Id.* Such appearances grew both more substantial and more common overtime as Wozniak reached national audiences in two Oprah Winfrey Show appearances in 1990 and 1992 and again in at least three national news broadcasts in the late 1990s and early 2000s. *Id.* Such substantial and regular investments into Hobbit Travel's goodwill demonstrate that Wozniak Travel would now suffer economic prejudice if it were enjoined from operating under the name Hobbit Travel. *See Jarrow Formulas,* 304 F.3d at 840 (prejudice existed where a "long-term investment" was made in marketing nutrition product to the public).

Evidentiary prejudice also inequitably harms Wozniak Travel. Evidentiary prej-

udice exists when relevant records are likely missing due to the passage of time or witnesses have died since the cause of action accrued. *Danjaq,* 263 F.3d at 955–956. Likely in part due to the passage of time, Wozniak Travel now cannot present complete financial records, publicity records or logs concerning its Hobbit Travel website. Wozniak Dec. ¶¶ 6, 10, 13. Wozniak Travel also cannot learn potentially important information from Tolkien Enterprises's now-deceased former trademark counsel. Considering this evidentiary prejudice alongside the overwhelming economic prejudice, the court finds that the overall prejudice is substantial.

■ Without materially disputing the economic and evidentiary harm, Tolkien Enterprises fashions a creative argument to contend that prejudice cannot be established for the purposes of laches because Wozniak Travel abandoned its mark through naked licensing. Abandonment through naked licensing occurs when a trademark owner fails to take the reasonable steps necessary to monitor the quality of goods produced by a licensee. *First Interstate Bancorp v. Stenquist,* 1990 WL 300321, at *3 (N.D.Cal. July 13, 1990) (Patel, J.). This failure to ensure quality control "may result in the trademark ceasing to function as a symbol of quality and controlled source." 3 McCarthy § 18:48. As a result, "a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.,* 289 F.3d 589, 596 (9th Cir.2002) (*citing Moore Bus. Forms, Inc. v. Ryu,* 960 F.2d 486, 489 (5th Cir.1992)).

Tolkien Enterprises argues that Wozniak Travel issued a naked license to Wisconsin-based Friedman's Hobbit Travel when Wozniak Travel acquiesced to the

naming of Friedman's Hobbit Travel in 1982 and failed to place any conditions on Friedman's right to use the Hobbit name. Wozniak Supp. Dec., Exh. M, 359:1–18. Similarly, Tolkien Enterprises argues that Wozniak Travel again issued a naked license in the early 1990s when it participated in a joint advertising campaign that listed the Chicago-based Hobbit International as Hobbit Travel. Wozniak Supp. Dec., Exh. M, 59:6–60:13. As a result of these "naked licenses," according to Tolkien Enterprises, Wozniak Travel abandoned its right to use the name Hobbit Travel and therefore cannot suffer the prejudice required to invoke laches.

 This argument is a creative one because abandonment through naked licensing is typically used as an affirmative defense to infringement. *See Blue Magic Products, Inc. v. Blue Magic, Inc.,* 2001 WL 34098657, *1 (E.D.Cal. Sept.5, 2001); *eMachines, Inc. v. Ready Access Memory, Inc.,* 2001 WL 456404, *4 (C.D.Cal. March 5, 2001). Here, however, Tolkien Enterprises presents abandonment not as a defense to a counterclaim of infringement— as defendant has brought no such claim— but instead as a means to negate the prejudice element of defendant's laches defense. Wozniak Travel contends as a preliminary matter that Tolkien Enterprises may not raise an abandonment argument on motion for summary judgment because abandonment was not pled as an affirmative defense. However, because Tolkien Enterprises uses abandonment not as an affirmative defense, but to negate an element of the laches defense, affirmative pleading is not required, and the court will consider Tolkien's argument on the merits.

 The court finds no cases applying naked licensing to bar a party from *defending* an infringement claim on the basis of laches, as Tolkien Enterprises suggests is appropriate here. Tolkien Enterprises argues for an absolutist reading of prece-

dent, citing this court's ruling that naked licensing is "inherently deceptive and constitutes abandonment of any rights to the trademark." *See First Interstate,* 1990 WL 300321, at *3. However, to zero in on this language alone is to lose the benefits of context in an attempt to infer a broad rule about the effects of naked licensing. The context of Tolkien Enterprises's supporting case law reveals that the cases cited stand only for the proposition that a claimant may not *advance* an infringement claim after granting a naked license to his mark. *See id.; Pa. Dutch Co., Inc. v. Pa. Amish Co., Inc.,* 1974 WL 20223 (Pa.Com. Pl. Aug.26, 1974). *See also Barcamerica,* 289 F.3d at 589 (holding that claimant may not pursue infringement claim after issuing naked license); *Halo Mgmt., LLC v. Interland, Inc.,* 2004 WL 1781013 (N.D.Cal. Aug.10, 2004) (Patel, J.) (holding that claimant may not pursue infringement claim after issuing naked license).

In *First Interstate,* abandonment through naked licensing barred the defendant realtor from asserting a counterclaim for trademark infringement. The defendant realtor had executed a written contract transferring the right to use the name First Interstate Realty to another without imposing any conditions on the mark's use. *See First Interstate,* 1990 WL 300321, at *1. The court determined that this contract constituted a naked license because the defendant realtor failed to protect his mark by not imposing any conditions on use. *Id.* at *4. In turn, this naked license barred the defendant realtor from asserting against plaintiff a counterclaim for trademark infringement. *Id.* Significantly, however, this court did not bar defendant realtor's laches defense as a de facto result of the realtor's naked license. *Id.; First Interstate Bancorp v. Stenquist ("First Interstate II"),* 1990 WL 299251 (N.D.Cal. Dec.12, 1990) (Patel, J.). Nor did the court hold that defendant's

naked license prevented defendant from showing prejudice. *First Interstate II*, 1990 WL 299251 at *4. Instead, in *First Interstate II*, this court considered laches in the context of the plaintiff banker's eight-year delay since the defendant realtor's initial use and only year-long delay since the realtor's naked licensing. *Id.* at *4. These relatively short delays, in combination with naked licensing, prompted the court to rule that laches did not apply. *Id.*

The second principal case cited by Tolkien Enterprises to support its naked licensing theory is a thirty-year-old case from the Pennsylvania Court of Common Pleas. *Pa. Dutch Co.*, 1974 WL 20223. The persuasive weight of such precedent is questionable. Further, like the *First Interstate* holding, *Pennsylvania Dutch Co.* only suggests that a claimant's rights are limited when he has issued a naked license. *Id.* at *47. In *Pennsylvania Dutch Co.*, the plaintiff novelty candy company filed an infringement claim against another novelty candy company operating under a similar name. *Id.* The court held that the plaintiff candy company could not maintain its infringement claim in light of the fact that plaintiff allowed a third candy company to sell similar candies using packaging indistinguishable from the plaintiff's own. *Id.* The case did not concern laches or the result of naked licensing by a defendant faced with an infringement claim. *Id.*

Without any case law to support the proposition that naked licensing precludes a party from defending against an infringement claim on the basis of laches, the court hesitates to adopt that rule here. *First Interstate* and *Pennsylvania Dutch Co.* both held that a party may not pursue an infringement claim where the party failed by way of naked licensing to protect its mark in the past. *First Interstate II*, 1990 WL 299251; *Pa. Dutch Co.*, 1974 WL 20223. These cases suggest Wozniak

Travel may well face difficulties if it asserts an infringement claim and attempts to exclude others from using the name Hobbit Travel. But the right to exclude is not at issue here—Wozniak does not assert a counterclaim of infringement against Tolkien or any other entity. Abandonment through naked licensing has never been applied in a case like this where a defendant asserts only the right to continue its *use* of a mark, and not its right to *exclude* use by another. The court declines to adopt such a rule today.

Moreover, *First Interstate II* suggests that naked licensing is but one factor in applying laches and must be considered in the context of plaintiff's delay. *First Interstate II*, 1990 WL 299251 at *4. In *First Interstate II*, laches did not apply because only a relatively short period of time elapsed since the defendant realtor's initial use and naked licensing. *Id.* The present case is distinguishable by the long period of Tolkien Enterprises's overall delay as well as Tolkien Enterprises's delay since the alleged naked licensing occurred in 1982, in the case of Friedman's Hobbit Travel, and the early 1990s, in the case of Hobbit International. These over decade-long delays between Wozniak Travel's alleged naked licensing and Tolkien Enterprises's present suit contrast significantly with the one-year filing delay after the naked licensing in *First Interstate II. See id.*

In looking at the purpose of a laches defense, it proves too much to deny that Wozniak Travel would suffer prejudice if Tolkien Enterprises were to proceed with its current claims. To preclude laches based on the alleged naked licensing would depart too widely from precedent and work unfairness in what should be an equitable doctrine designed to achieve a just outcome. As a result, the court concludes that defendant has suffered both economic

and evidentiary prejudice as a result of plaintiff's delay, and that defendant's conduct and relationships with respect to Friedman's Hobbit Travel and Hobbit International, allegedly a "naked license," do not defeat defendant's showing of prejudice.

CONCLUSION

On equitable consideration of all factors involved and upon the conclusion that the status quo will best protect market competition and defendant's investment in Hobbit Travel, defendant's motion for summary judgment on the basis of laches is GRANTED. Plaintiff's motion for summary judgment on the basis of laches is DENIED. Each of plaintiff's claims against defendant is DISMISSED.

IT IS SO ORDERED.