**FITBUG LIMITED, Plaintiff,**

v.

**FITBIT, INC., Defendant.**

**Case No. 13–1418 SC**

United States District Court,
N.D. California.

Signed January 26, 2015

Simon J. Frankel, Matthew D. Kellogg, Covington & Burling LLP, San Francisco, CA, Alan Ross Arkin, Debra Bodian Bernstein, Linda S. Roth, Mark Jon Rosenberg, Tarter Krinsky Drogin LLP, New York, NY, Kathryn Elizabeth Cahoy, Covington and Burling LLP, Redwood Shores, CA, for Plaintiff.

Andrew P. Bridges, Jedediah Wakefield, Sean Steven Wikner, Todd Richard Gregorian, Fenwick & West LLP, Clement S. Roberts, Michael Aaron Feldman, Timothy Chen Saulsbury, Durie Tangri LLP, San Francisco, CA, Ciara Nicole Mittan, Fenwick and West LLP, Mountain View, CA, for Defendant.

### *ORDER ON MOTIONS FOR SUMMARY JUDGMENT*

SAMUEL CONTI, District Judge

## I. *INTRODUCTION*

Now before the Court are two motions for summary judgment in this trademark infringement and unfair competition case. First, Plaintiff Fitbug Ltd. ("Fitbug") seeks partial summary judgment on likelihood of confusion; Defendant Fitbit, Inc.'s ("Fitbit") affirmative defense of laches; and Fitbit's fifth and sixth counterclaims. ECF No. 47–3 ("Fitbug Mot."). Second, Fitbit moves for summary judgment on two affirmative defenses: laches and acquiescence. ECF No. 50 ("Fitbit Mot."). Both motions are fully briefed,[1] and appropriate resolution without oral argument under Civil Local Rule 7–1(b). Relatedly, Fitbit has filed an objection to reply evi-

---

1. ECF Nos. 61–3 ("Fitbit Opp'n"); 65–3 ("Fitbug Opp'n"); 71–3 ("Fitbit Reply"); 74 ("Fitbug Reply").

dence under Civil Local Rule 7–11(b) or, in the alternative, a motion to file supplemental briefing. ECF No. 81 ("Fitbit Obj."). Fitbug opposes that request. ECF No. 83. For the reasons set forth below, Fitbug's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Fitbit's motion for summary judgment is GRANTED. Fitbit's objection to reply evidence is DENIED, but the alternative motion for leave to file supplemental briefing is GRANTED.

## II. BACKGROUND

Fitbit and Fitbug both produce portable electronic fitness tracking devices. These devices are wearable, and collect data about a user's steps walked, calories burned, activity intensity, sleep, and other health and fitness metrics. Portable electronic fitness tracking devices also connect to the internet or a user's computer or smartphone, and, in conjunction with an application or website, allow the user to view and analyze the data collected, set or track fitness goals, and collect other information relevant to the user's health and fitness plans.

Fitbug owns two federal trademark registrations, and Fitbit also owns a federal trademark registration.

There have been several variations of the parties' logos throughout their history, but the relevant logos are:

Fitbug's current design:

![fitbug]

Fitbit's current design:

![fitbit]

Fitbug, headquartered in the United Kingdom and founded in 2004, was one of the first companies to enter the portable electronic fitness tracker market. Since that time, Fitbug has made both sales directly consumers ("business-to-consumer" sales), and so-called "business-to-business-to-consumer" sales of its products. Business-to-business-to-consumer sales include sales to health insurance plans, corporate wellness programs, and other programs, and generally involve incentives like bulk discounts as well as special tools for tracking group fitness goals or running fitness competitions. Initially, Fitbug focused on the British market, but in 2005 it sought to sell its products in the United States as well. Since that time, however, Fitbug's success in the United States market has been limited.

Fitbit, headquartered in San Francisco, is one of the leading providers of portable electronic fitness trackers. James Park

and Eric Friedman founded the company in March 2007. Fitbit's name was chosen after a poll on Facebook, and at the time the name was chosen, as far as Park is aware, nobody at Fitbit was aware of Fitbug's existence. ECF No. 46–5 ("Park Decl.") ¶¶ 4–6. However, by December 2007, prior to the launch of Fitbit's website or the sale of its first products, Friedman sent Park a link to the Fitbug website, although Park contends that he thought little of the link at the time. *Id.* ¶ 7.

Fitbit first announced its products on September 9, 2008. By the next day, Fitbit's website featured information regarding its first device, the Fitbit Classic, as well as a link for businesses or individuals to place orders for the devices. *Id.* ¶ 13; Ex. 5. Nonetheless, Fitbit did not begin shipping its products until September 2009, and early on, only a small amount of Fitbit's sales were in the business-to-business-to-consumer category. However, over time Fitbit's sales grew substantially both in general and in the business-to-business-to-consumer market.

The day Fitbit announced its product, Fitbug received several emails and other contacts stating that Fitbit was entering the portable electronic fitness tracking device market. Additionally, a representative of Fitbug sought (unsuccessfully) to contact Fitbit to explore a potential business partnership. Over the next weeks and months, internal communications show that Fitbug was concerned about potential competition from Fitbit, and was contemplating various responses including sending a cease and desist letter. *See* ECF No. 46 ("Wakefield Decl.") Exs. 17–23. Nevertheless, Fitbug did not assert any violation of its trademark rights at that time. Instead, Fitbug first assert infringement of its rights by Fitbit in a December 2011 letter. Park Decl. at ¶ 26; Ex. 11. Fitbit denied infringement, and subse-

quent letters failed to resolve the dispute. *Id.*

Fitbug filed suit on March 29, 2013 alleging trademark infringement under 15 U.S.C. Section 1114(1), unfair competition under 15 U.S.C. Section 1125(a), common law trademark infringement and unfair competition, violations of the California Business and Professions Code Section 17200, and seeking cancellation of Fitbit's trademark registration. *See* ECF No. 1 ("Compl."). Fitbit counterclaimed, alleging unfair competition and false or misleading advertising under California law. ECF No. 43 ("Am. Answer & Counter–Cls.") at ¶¶ 189–255.

Now, both parties have filed motions for summary judgment seeking to resolve significant portions of these claims. The matter is currently set for trial beginning on February 9, 2015.

## III. *LEGAL STANDARD*

Entry of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment should be granted if the evidence would require a directed verdict for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burdens of production and persuasion. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000).

## IV. *DISCUSSION*

Fitbug moves for summary judgment on three issues. First, Fitbug believes the Court should find as a matter of law that they have demonstrated a likelihood of confusion among consumers. Second, Fitbug argues that laches do not bar its claims. Finally, Fitbug seeks summary

judgment on Fitbit's unfair competition and false advertising claims on the grounds that that Fitbit lacks statutory standing to bring those claims.

Fitbit opposes these arguments and moves for summary judgment in its own right arguing that Fitbug's claims are barred by laches, and, in any event, Fitbug's claims are barred by its acquiescence to Fitbit's use of the Fitbit mark. Because the Court finds that Fitbug's claims are barred by laches, the Court need only address that issue and Fitbit's unfair competition and false advertising claims.

### A. *Laches*

■ Fitbit's primary argument is that Fitbug's claims are barred by laches. "Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 (9th Cir.2002) (internal citations and quotation marks omitted). Laches is a defense to both Lanham Act claims (including trademark infringement and unfair competition) as well as to California state law claims. *Id.*; *Saul Zaentz Co. v. Wozniak Travel, Inc.,* 627 F.Supp.2d 1096, 1109 (N.D.Cal. 2008); *see also Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Ouest De La France,* 245 F.3d 1359, 1362, 1364 (Fed. Cir.2001) (holding that a petition for cancellation of registered trademark was barred by laches). A claim is only barred by laches if the defendant can show "(1) unreasonable delay by plaintiff in bringing suit, and (2) prejudice...." *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 997 (9th Cir.2006) (citing *Couveau v. Am. Airlines, Inc.,* 218 F.3d 1078 (9th Cir. 2000)).

■ Two issues determine whether a delay was unreasonable. "First [a court] assess[es] the length of delay, which is measured from the time the plaintiff knew or should have known about its potential cause of action." *Jarrow,* 304 F.3d at 838. Next, the Court must "decide whether the plaintiff's delay was unreasonable." *Id.* The Court will address each in turn.

■ First, the Court must determine when Fitbug "knew or should have known about its potential cause of action." *Id.* This standard can be satisfied by either actual or constructive knowledge, because "[c]ompanies expecting judicial enforcement of their marks must conduct an effective policing effort." *Grupo Gigante Sa De CV v. Dallo & Co. Inc.,* 391 F.3d 1088, 1102 (9th Cir.2004) (emphasis omitted). Nonetheless, a trademark holder is " 'not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of [its] shotgun instantly upon spotting a possible infringer.' " *Adidas Am., Inc. v. Kmart Corp.,* No. CV–05–120–ST, 2006 WL 2044857, at *8 (D.Or. June 15, 2006) (quoting *Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 127 (S.D.N.Y.1989)).

■ The undisputed facts are as follows. Fitbit announced its products on September 9, 2008 and began receiving significant media coverage. Park Decl. ¶ 10. By the next day, Fitbit's website was active and visitors to the site could see Fitbit's trademark, learn about its products, and place an order for the original Fitbit device. *Id.* ¶ 13, Ex. 5. Beginning that day and continuing for some time after, individuals within and outside the Fitbug organization contacted Fitbug to point out Fitbit's entry in the market. Those emails refer to Fitbit as, among other things, "[a]nother competitor," suggest aspects of Fitbit's user interface are a "total ripoff," and note that while Fitbit's entry into the market is "[n]othing to panic about, ... [Fitbit] will become an issue and I'd rather be one step ahead." Wakefield Decl. Exs. 9–17. In

reference to Fitbit's announced products and user interface, a consultant wrote to Paul Landau, Fitbug's CEO, that Fitbit "appears to be doing what Fitbug does but slightly more ..." and noting that Fitbit "appear[s] to only be available in the US." *Id.* Ex. 14.

Over the next several months, Fitbug explored several potential responses to Fitbit. First, beginning two days after Fitbit announced its products, Fitbug's Chief Marketing Officer ("CMO") (unsuccessfully) attempted to contact Fitbit to discuss potential partnerships. *Id.* Exs. 17, 20. Then, on October 14, in an email conversation with the CMO, an attorney said, "I was wondering if they were infringing on your IP—sounds like some improvements on your idea, but pretty close to [F]itbug including the name." *Id.* Ex. 19. A month later a Fitbug employee wrote to Landau "to remind [him] of Fitbit" because he was "thinking of sending them a cease and desist." *Id.* Ex. 21. Around the same time, Landau referred to Fitbit as "thieving bastards[.]" *Id.* Ex. 23.

Nevertheless, Fitbit did not begin shipping its products to consumers until September 2009. After that point, Fitbug received several further emails regarding Fitbit's activities. For instance, another lawyer contacted Fitbug's CMO to point out that Fitbit "could cause confusion in the classic trademark sense." *Id.* Ex. 31.

■ That statement—that Fitbit's mark could cause consumer confusion—is the crucial issue for determining when Fitbug knew or should have known of its potential cause of action. "The essence of ... a [trademark infringement] claim centers on the likelihood of confusion between two marks or products." *Internet Specialties W., Inc. v. Milon–DiGiorgio Enters., Inc.,* 559 F.3d 985, 990 (9th Cir.2009). As a result, when we ask whether Fitbug or another trademark owner "knew or should have known" of its potential cause of ac-

tion, what we are really asking is when the mark holder "knew or should have known about the likelihood of confusion between" the marks. *Id.*

The Ninth Circuit's answer to this question in *Internet Specialties* is instructive. In that case, the parties were internet service providers with similar names ("ISWest.com" and "ISPWest.com"). *Id.* at 988. ISWest became aware of ISPWest's existence shortly after ISPWest registered its domain name in late 1998. *Id.* At that time, the two companies offered somewhat different services—ISWest offered dial-up and high-speed access nationwide, while ISPWest initially provided only dial-up access in Southern California. *Id.* According to ISWest's CEO, the company was not concerned about ISPWest at the time (even though they were aware of its existence) because ISPWest did not offer high speed internet and because the highly volatile internet startup market meant that ISPWest might well go out of business. *Id.* Instead, ISWest waited to file suit alleging trademark infringement until 2005, after ISPWest had expanded into a provider of nationwide, high-speed internet access. *Id.* Despite this gradual expansion into the high speed internet market, the Ninth Circuit found that the laches period started in 1998. The court noted that even though ISPWest "did not offer DSL in 1998, both companies did offer internet access, e-mail, and web hosting in the same geographic area under remarkably similar names," and thus "[a] prudent business person should recognize the likelihood of confusion to consumers under such circumstances...." *Id.* at 990–91.

In this case, the Court finds that Fitbug knew or should have known of the likelihood of confusion by, at the latest, September 2008, after Fitbit's launch. While Fitbit was not yet shipping its products, at that time, Fitbit was selling similar devices

"in the same geographic area under [a] remarkably similar name[ ].... " *Id.* at 990. As a result, a prudent business person should have recognized the likelihood of confusion at that point. *See id.*

Fitbug argues essentially for a per se rule that the laches period can never run "prior to the defendant's actual sale of its goods or services." Fitbug Opp'n at 8. There are several problems with that proposal. First, it is undisputed that Fitbit *was* selling its product in September 2008; it simply had not shipped the products yet. Park Decl. ¶ 13 ("On September 9 or September 10, 2008, Fitbit's website .... contained a description and images of the Fitbit fitness tracker *and invited any potential customer to order the product by clicking a prominent "BUY" button."*) (emphasis added).

██ Moreover, Fitbug's support for this rule rests on two flawed premises. First, Fitbug argues that "concrete evidence" of several of the likelihood of confusion factors in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979) (the "*Sleekcraft* factors") was lacking in September 2008 (and is lacking in all pre-sale trademark infringement cases). But, as the Ninth Circuit has stated, "each [*Sleekcraft* ] factor represents only a facet of the single dispositive issue of likely confusion," and need not be satisfied in every case or mechanically applied. *Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1141 (9th Cir.2002); *see also Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1008 (9th Cir. 2001) ("Although these are all factors that are appropriate for consideration in determining the likelihood of confusion, they are not necessarily of equal importance, nor do they necessarily apply to every case."). Thus, even if evidence were lacking on the marketing channels and proximity of goods at sale factors, the two factors Fitbug specifically identified as lacking evidence in September 2008, that would not have

barred a finding of likelihood of confusion at that time. Similarly, Fitbug's point that "evidence of widespread actual consumer confusion was not available until 2012" is misplaced, because *actual* confusion is not required to demonstrate a *likelihood* of confusion. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,* 638 F.3d 1137, 1151 (9th Cir.2011); *see also Pfizer Inc. v. Sachs,* 652 F.Supp.2d 512, 523 (S.D.N.Y.2009) ("The absence of proof of actual confusion is not fatal to a finding of likelihood, particularly where, as here, the junior mark has been in the marketplace for a relatively short period of time.") (citations and internal alterations omitted).

Fitbug's second argument, that between September 2008 and September 2009 (when Fitbit first shipped its products) and it appeared possible that Fitbit would go out of business, is irreconcilable with the purpose of laches. As Judge Learned Hand wrote in the copyright context:

it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win.

*Haas v. Leo Feist, Inc.,* 234 F. 105, 108 (S.D.N.Y.1916); *see also Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 951 (9th Cir. 2001) (discussing Hand's justification for laches in the trademark context). Here too, Fitbug's argument is that it should be permitted to wait and watch, with full knowledge of Fitbit's allegedly infringing use, as Fitbit invested substantial sums of money in advertising and building up goodwill in its allegedly infringing brand, only to intervene once those investments panned out. That result is not just inequi-

table, it is also inefficient, and renders this argument untenable. *See also Grupo Gigante*, 391 F.3d at 1102–03 (noting that "the plaintiff 'cannot simply wait without explanation to see how successful the defendant's business will be and then ask for an injunction to take away good will developed by defendant in the interim.' ") (quoting 5 *McCarthy on Trademarks* § 31:14, at 31–50).

The Court concludes that Fitbug had actual knowledge of its potential causes of action against Fitbit in September 2008. As a result, the length of Fitbug's delay runs for approximately four and a half years until it filed suit in March 2013.

Even though Fitbug delayed approximately four and a half years before filing suit, that does not end the inquiry. *See Internet Specialties*, 559 F.3d at 991. Instead, the Court must still decide whether Fitbug's delay in bringing suit was reasonable. *Id.*

█ In assessing whether a plaintiff's delay was reasonable, the Court looks to the limitation period for the most analogous state law cause of action. *Jarrow*, 304 F.3d at 837. If Fitbug's claims were "filed within the analogous state limitation period, the strong presumption is that laches is inapplicable; if the claim is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit." *Id.* (collecting cases); *see also Internet Specialties*, 559 F.3d at 990; *Miller*, 454 F.3d at 997.

The parties dedicate a significant amount of attention to the question of what the most analogous cause of action is to trademark infringement and unfair competition in California law, and what the statute of limitations is for such claims. For years, the Ninth Circuit and district courts in California have almost universally assumed the answer is the four-year limitation periods contained in California Code of Civil Procedure Sections 337 or

343. *See, e.g., Internet Specialties*, 559 F.3d at 990 n. 2; *Miller*, 454 F.3d at 997 n. 11; *DC Comics v. Towle*, 989 F.Supp.2d 948, 971–72 (C.D.Cal.2013); *RSI Corp. v. IBM Corp.*, No. 5:08–CV–3414–RMW, 2012 WL 3277136, at *13 (N.D.Cal. Aug. 9, 2012); *Experexchange, Inc. v. Doculex, Inc.*, No. C–08–03875 JCS, 2009 WL 3837275, at *19 n. 23 (N.D.Cal. Nov. 16, 2009); *ATM Express, Inc. v. ATM Express, Inc.*, Civ. No. 07cv1293–L(RBB), 2009 WL 2973034, at *3 (S.D.Cal. Sept. 11, 2009); *Miller v. Glenn Miller Prods.*, 318 F.Supp.2d 923, 942 n. 11 (C.D.Cal.2004), *aff'd* 454 F.3d 975, 997 & n. 11 (9th Cir. 2006); *but see Internet Specialties W., Inc. v. ISPWest*, No. CV 05–3296 FMC (AJWx), 2006 WL 4568073, at *1 (C.D.Cal. Nov. 14, 2006), *aff'd sub nom. Internet Specialties W., Inc. v. Milon–DiGiorgio Enters., Inc.*, 559 F.3d 985 (9th Cir.2009) (rejecting the defendant's argument that the three-year period under California Code of Civil Procedure Section 338(d) applied because the case involved trademark infringement, and not false and deceptive advertising under 15 U.S.C Section 1125(a)(1)(B)); *High Country Linens, Inc. v. Block*, No. C 01–02180 CRB, 2002 WL 1998272, at *2 n. 1 (N.D.Cal. Aug. 20, 2002) (applying the two-year period in California Code of Civil Procedure Section 339 to common law trademark infringement claims). However, Fitbit points out that none of these cases actually analyze the question in depth, and in nearly all the cases applying a four-year limitation, the parties agreed that using the four-year period was appropriate.

Instead, Fitbit argues that the Ninth Circuit's references to the four-year limitations period in *Miller* and *Internet Specialties* overlooked important California precedent bearing on the statute of limitations for trademark infringement and is inconsistent with both California law and prior Ninth Circuit precedent. Specifically, Fitbit argues that because the Califor-

nia Supreme Court stated in *Mission Imports, Inc. v. Superior Court*, 31 Cal.3d 921, 931, 184 Cal.Rptr. 296, 647 P.2d 1075 (Cal.1982), that "action[s] for trademark infringement sound[ ] in tort," the two-year limitations period for tort claims in California Code of Civil Procedure Section 339 applies. *See also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 719–20 (9th Cir.2004) (applying Montana law and concluding that because a claim for state trademark infringement "generally sounds in tort," Montana's three-year statute of limitations for unspecified tort actions applied); *High Country Linens*, 2002 WL 1998272, at *2 n. 1 (finding that "common law trademark infringement claim[s][are] also limited by Cal.Civ.Proc.Code § 339" in part because of *Mission Imports*' holding that an "action for trademark infringement sounds in tort").

While the Court believes that Fitbit's argument is meritorious, and that the line of cases assuming the four-year limitation period in Section 343 is applicable to trademark infringement and unfair competition claims is questionable, the Court need not resolve this issue. Because the Court previously found that the laches period began four and a half years before Fitbug filed suit, Fitbug's claims are presumptively untimely even under the four-year period it urges. Accordingly, the Court presumes that Fitbug's claims are untimely. *See Saul Zaentz*, 627 F.Supp.2d at 1113. Nevertheless, the Court must still "consider the validity of the reasons proffered by the plaintiff to excuse its delay and overcome the presumption of laches." *Id.*

▮▮▮▮ First, Fitbug argues that the doctrine of progressive encroachment justifies its delay. " 'Under this doctrine, the trademark owner need not sue in the face of *de minimis* infringement by the junior user.' " *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1110 (9th Cir.2006) (quoting *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1154 (9th Cir.1982). "Instead, a trademark owner's obligation to sue arises when the junior user redirects or expands its business into different regions or markets bringing it into direct competition with the trademark owner." *Saul Zaentz*, 627 F.Supp.2d at 1114 (citing *Tillamook*, 465 F.3d at 1110); *see also Grupo Gigante*, 391 F.3d at 1103 ("A defendant can encroach on a plaintiff's mark by expanding its business into different regions or different markets."). Nevertheless, "[a] junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment." *Tillamook*, 465 F.3d at 1110.

▮▮▮ Specifically, Fitbug argues that the doctrine of progressive encroachment applies because Fitbit expanded into the so-called 'business-to-business-to-consumer' market "no earlier than mid–2011, less than two years before Fitbug filed suit." Fitbit Opp'n at 9. As explained earlier, the business-to-business-to-consumer market is made up of health insurance plans and corporate wellness programs, among others, and makes up a significant (although not always the majority, *see* Wakefield Decl. ¶¶ 5, 9, Ex. 4 at Interrog. No. 18, Ex. 8) share of Fitbug's sales.

Fitbug bases its view of Fitbit's alleged progressive encroachment on the declaration of its CEO, Paul Landau, who contends that:

"[f]rom 2008 through the [sic] mid–2011, it was the understanding of myself and others at Fitbug[2] that Fitbit was focus-

---

**2.** Landau's description of Fitbit's activities throughout the relevant period is insufficient to create an issue of material fact as to Fitbit's activities because Landau's testimony on those issues would be inadmissible. *See* Fed. R.Civ.P. 56(c)(4); *Orr v. Bank of Am., NT &*

ing its distribution efforts on the direct to consumer channel .... [and] to the extent Fitbit was selling its products through the [business-to-business-to-consumer] market, (a) its distribution was in the form of offering bulk discounts to [business-to-business-to-consumer] customers, (b) such sales were almost exclusively a result of potential [business-to-business-to-consumer] customers reaching out to Fitbit as opposed to Fitbit initiating marketing contact, and (c) Fitbit was not providing Add–On Services to its [business-to-business-to-consumer] customers.

Landau Decl. ¶ 18. Fitbug describes "Add–On Services" as including, among other things, collecting and analyzing additional data for business-to-business-to-consumer customers, creating separate web pages for business-to-business-to-consumer users, and offering additional exercise games or challenges in which fitness groups may participate. *Id.* at ¶ 5. "To Fitbug, if a distributor of activity trackers to [business-to-business-to-consumer] customers was not providing Add–On Services to these customers, that distributer [sic] was effectively not a participant in the [business-to-business-to-consumer] market and as a result, not a competitor of Fitbug." *Id.* at ¶ 18. Furthermore, Fitbug points out that Fitbit did not add a "Corporate Wellness" link on its website, which specifically targets the business-to-business-to-consumer market, until April 2012. Finally, Fitbug contrasts Fitbit's business-to-business-to-consumer sales in 2009, which were only a small percentage of Fitbit's overall sales, with its 2013 business-to-business-to-consumer sales, which accounted for substantially larger percent of Fitbit's sales. ECF No. 66 ("Rosenberg Decl.") Ex. 6.

The problem with this view is that Fitbit's growth in the business-to-business-to-consumer market was simply the growth of its existing business, not expansion into a new market. Even drawing all justifiable inferences in Fitbug's favor, *see Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, the undisputed facts show that Fitbit was selling its products directly to consumers and businesses from the outset. Park Decl. ¶ 28. Furthermore, Fitbit hired an independent contractor in 2008 in an effort to develop additional business-to-business-to-consumer sales. ECF No. 46–9 ("McDonough Decl.") at ¶¶ 3–6. Additionally, it is also undisputed that Fitbit received inquiries from and made sales to business-to-business-to-consumer customers from its inception. *Id.* at ¶ 7. While Fitbug points out that Fitbit's sales in the business-to-business-to-consumer market have grown substantially, it is also undisputed that Fitbit had sales in that market since its inception. As the Ninth Circuit has said, "growth alone does not infringement make," *Prudential Ins.*, 694 F.2d at 1154, and all phases of Fitbit's business grew rapidly from the beginning, including its business-to-business-to-consumer sales. *See* Wakefield Decl. at Ex. 7.

Nor do the facts support Fitbug's view that Fitbit's initial use of its mark was *de minimis*. On the contrary, Fitbit's use of its mark was substantial from the outset, and Fitbit received both national and international media attention at the beginning. Park Decl. ¶¶ 12–13, 34. In short, this media attention and prominent use of the mark (as well as Fitbug's internal response) demonstrate that even if "[Fitbug] may have had no obligation to sue a small one-shop brick and mortar infringer, [Fitbit's] use of the mark was not *de minimis.*" *Saul Zaentz*, 627 F.Supp.2d at 1115.

*SA*, 285 F.3d 764, 773 (9th Cir.2002) ("A trial court can only consider admissible evidence

in ruling on a motion for summary judgment.") (citations omitted).

Further underscoring these conclusions, two years before Fitbug argues Fitbit entered the business-to-business-to-consumer market, Fitbug · knew or should have known the two companies were directly competing in that market. First, Fitbug's CEO admits that in 2009 Fitbug and Fitbit were competing directly to provide a fitness program for several schools. ECF No. 67 ("Landau Opp'n Decl.") ¶ 8. Similarly, although the program was to take place in Europe and Fitbug's CEO was apparently unaware of Fitbit's participation, representatives of Oracle UK (a prospective business-to-business-to-consumer customer) copied Landau, Fitbit CEO James Park, and representatives of several other portable electronic fitness tracking device companies on the same emails regarding a potential corporate wellness program. *Id.* at ¶¶ 10–11; Park Decl. ¶¶ 23–25 & Exs. 9–10. Even though Fitbug's CEO states he was personally unaware of that instance of direct competition in the business-to-business-to-consumer market, "[h]ad [Fitbug] conducted further investigation, as a reasonable person would have done . . ., it would have discovered that [Fitbit]" had been directly competing with Fitbug in the business-to-business-to-consumer market from the outset. *Saul Zaentz*, 627 F.Supp.2d at 1112.

Also undermining Fitbug's argument is its artificial and cramped description of the relevant market. Fitbug states that, in its view, unless another portable electronic fitness tracker company was providing similar Add–On Services to those Fitbug provided, that company was effectively not a competitor in the business-to-business-to-consumer market. But Fitbug offers no objective explanation for why this is the case, and in any event, a close reading of the Ninth Circuit's progressive encroachment cases shows that expansion into a "different market" requires something more than simply expanding existing marketing channels or increasing sales in an area closely related to the junior mark holder's existing business.

Take, for instance, the Ninth Circuit's analysis of progressive encroachment in *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association.* In *Tillamook*, the plaintiff was a cheese company suing a defendant smoked meat company, both located in Tillamook County, Oregon. 465 F.3d at 1105. While the cheese company was aware of the meat company from the outset, it did not sue until twenty-five years later, once the meat company began selling its products in supermarkets—a move the cheese company argued constituted progressive encroachment. *Id.* at 1105, 1110. The Ninth Circuit disagreed, finding that the meat company's expansion into supermarket sales was not an expansion into a different region or different market, but rather "growth of its existing business and the concomitant increase in its use of the mark. . . ." *Id.* at 1110. In so doing, the *Tillamook* court noted that if the meat company had " 'expanded its business' into selling cheese in grocery stores, it would be a different story." *Id.*; *see also Internet Specialties*, 559 F.3d at 991 (expanding from localized sales of dial up service to nationwide DSL service was "a natural growth of . . . existing business); *Grupo Gigante*, 391 F.3d at 1103 (rejecting progressive encroachment where the plaintiff was aware of a potential conflict but chose to wait to bring suit until the conflict was actual); *Saul Zaentz*, 627 F.Supp.2d at 1115 (finding the move to internet sales "was the natural outgrowth of [the defendant's] existing business," and "the fact that [plaintiff's] internet sales predate [defendant's] sales is immaterial").

Similarly, in this case, any expansion into the business-to-business-to-consumer market (no matter how that market is constituted) was simply the natural growth

of Fitbit's existing business. If Fitbit had only entered the portable electronic fitness tracking market after several years of marketing distinct products, the Court might reach a different conclusion. But here, Fitbit was selling the same type of products, to the same type of customers, with the actual or constructive knowledge of Fitbug from 2008 through 2011 and beyond. *See Grupo Gigante,* 391 F.3d at 1103 (rejecting a progressive encroachment claim where defendant's use of the mark did not change over the relevant period); *accord* 6 *McCarthy on Trademarks & Unfair Competition* § 31:20 (4th ed.) ("Progressive encroachment denotes some change in direction, such as expansion into different territories or into a different type of business. It must be something more than a normal expansion in quantity within its original line of business that most businesses will experience over time."). In short, the undisputed facts simply do not support Fitbug's view that Fitbit's subsequent activities constituted a move into the "same or similar market area" or placed Fitbit "more squarely in competition with [Fitbug]," because the companies were already squarely competing in the same or similar market area beginning in 2008. Opp'n at 10 (quoting *Kellogg Co. v. Exxon Corp.,* 209 F.3d 562, 573 (6th Cir.2000)).

██ Despite the presumption in favor of laches and Fitbug's inability to show progressive encroachment, the Court must still weigh a series of factors to determine whether Fitbug's delay in bringing suit was reasonable. Specifically, these factors, the so-called *E–Systems* factors, direct the Court to analyze "(1) the strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing [the] mark; (3) harm to [the] senior user if relief is denied; (4) good faith ignorance by [the] junior user; (5) competition between [the] senior and junior users; and (6)[the] extent of harm suffered by the

junior user because of [the] senior user's delay." *E–Systems, Inc. v. Monitek, Inc.,* 720 F.2d 604, 607 (9th Cir.1983); *see also Tillamook,* 465 F.3d at 1108.

The first two factors weigh in Fitbit's favor. First, while both Fitbit's and Fitbug's marks are descriptive or suggestive, and thus relatively weak, *see Grupo Gigante,* 391 F.3d at 1102 ("Descriptive or suggestive marks are relatively weak.") (citing *Accuride Int'l Inc. v. Accuride Corp.,* 871 F.2d 1531, 1536 (9th Cir.1989); *ATM Express,* 2009 WL 2973034, at *4, on balance, Fitbit's mark is substantially more valuable by virtue of its "rapid and continuing growth" relative to Fitbug. *See E–Systems,* 720 F.2d at 607. As a result, this factor weighs in Fitbit's favor. Second, as discussed throughout the foregoing analysis, Fitbug was not diligent in protecting its mark and did not assert its trademark rights against Fitbit's from September 2008, when Fitbit announced its products and began offering them for sale on its website, to December 2011, when it sent a cease and desist letter to Fitbit, and did not file suit until 2013. As the Court has explained, this delay was not justified, and accordingly this factor weighs against Fitbug.

The third factor and fifth factors either weigh in Fitbug's favor or can be assumed to do so for the sake of argument. The third factor, the harm to Fitbug if relief is denied, "turns largely on the court's analysis of the likelihood of confusion." *RSI,* 2012 WL 3277136, at *18 (citing *Grupo Gigante,* 391 F.3d at 1103). But here, the Court cannot find that the likelihood of confusion standard is satisfied as a matter of law because there are genuine issues of material fact as to several of the *Sleekcraft* factors. *See* 599 F.2d at 348–49. In particular, there are disputed factual issues going to the existence of actual confusion, as well as the similarity of the parties'

marks and sophistication and care "likely to be exercised by the purchaser[s]...." *Id.* at 348; *see* Fitbit Opp'n at 16–22 (detailing these factual disputes). As a result, the Court cannot decide likelihood of confusion (and hence the weight of this factor) as a matter of law. Nonetheless, even assuming this factor weighs strongly in Fitbug's favor, as the fifth factor, competition between the users, does, *see RSI*, 2012 WL 3277136, at *18 (citing *Grupo Gigante*, 391 F.3d at 1104) (noting that where both parties offer "similar products to the same companies in the same market, [the competition between users] factor plainly weighs against a finding of laches"), it would still be insufficient to sway the overall weight of the factors.

The remaining factors, good faith ignorance by Fitbit and the harm suffered by Fitbit as a result of Fitbug's delay weigh in Fitbit's favor as well. First, while it is undisputed that Fitbit was aware of Fitbug's existence prior to announcing or selling its products, it is also undisputed that Fitbit selected its mark before it was aware of Fitbug, and even after learning of Fitbug's existence, Fitbit continued to believe there was no likelihood of confusion. Because this factor focuses on whether "[Fitbit] had prior knowledge of [Fitbug] *when it decided to adopt* the name [Fitbit]," this factor weighs in Fitbit's favor. *Internet Specialties*, 2006 WL 4568073, at *4, *aff'd* 559 F.3d 985 (9th Cir.2008) (emphasis added). Furthermore, because Fitbit "has continued to build a valuable business around its trademark during the time that [Fitbug] delayed the exercise of its legal rights," it has suffered "expectation" or "economic prejudice." *Grupo Gigante*, 391 F.3d at 1105; *see also Danjaq*, 263 F.3d at 956 (discussing economic prejudice); *McCarthy* § 31:12 (discussing expectation prejudice). Here, Fitbit has provided substantial evidence detailing its efforts through the period of Fitbug's delay to build its business, generating substantial sales, hiring large numbers of employees, and developing products, all of which it offers under the well-known Fitbit mark. Those efforts, and Fitbit's products, have garnered awards and substantial media coverage. The economic prejudice would be severe if Fitbit were to now lose the rights to the Fitbit name. *See Saul Zaentz*, 627 F.Supp.2d at 1118 (reaching a similar conclusion where the defendant had spent millions of dollars on advertising, appeared on television promoting its business, and generated substantial goodwill under its existing name).

Nevertheless, Fitbug argues, relying on two out-of-jurisdiction authorities, that Fitbit cannot be prejudiced because Fitbit knew of Fitbug's rights prior to making these investments. *See Roederer v. J. Garcia Carrion, S.A.*, 569 F.3d 855, 859 (8th Cir.2009); *Perini Corp. v. Perini Constr., Inc.*, 715 F.Supp. 719, 725 (D.Md. 1989), *rev'd on other grounds*, 915 F.2d 121 (4th Cir.1990). But Fitbit points out that the Ninth Circuit and other courts have found prejudice even where the defendant was aware of the plaintiff's existence prior to the prejudice occurring. *See, e.g., Danjaq*, 263 F.3d at 956; *Saul Zaentz*, 627 F.Supp.2d at 1118 (finding the defendant would suffer economic prejudice even though it chose its business name with full knowledge of the plaintiff's mark). Furthermore, one of the cases on which Fitbug relies for this argument, *Roederer*, applied this limitation on prejudice only where "plaintiff *objected* to the use of the mark." 569 F.3d at 859. However as the Court found earlier, Fitbug did not object to Fitbit's use of its mark until its cease-and-desist letter in December of 2011, after Fitbit had already expended substantial effort building up good will in its mark. As a result, the Court rejects this argument and finds that Fitbit's claim of laches

is supported by substantial economic prejudice.

Considering the above factors, the Court finds they weigh in Fitbit's favor. Nonetheless, Fitbug has one remaining argument: that Fitbit's willful infringement bars it from asserting laches.

■ Because laches is an equitable doctrine, the exception to laches for willful infringers stems from "the equitable maxim that 'he who comes into equity must come with clean hands.'" *Danjaq*, 263 F.3d at 956 (9th Cir.2001) (quoting *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000)). This rule was originally applied by Judge Hand in the copyright piracy context and was subsequently applied to "intentional and fraudulent" trademark infringement by the Ninth Circuit. *See Nat'l Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir.1955) (citing *Menendez v. Holt*, 128 U.S. 514, 523, 9 S.Ct. 143, 32 L.Ed. 526 (1888)); *Haas*, 234 F. at 108. Hand mused that while all would agree "that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in violation, and to intervene only when his speculation proved a success," such a course of conduct by a copyright owner "might be irrelevant" if "the defendant [is] a deliberate pirate...." *Haas*, 234 F. at 108.

In *Danjaq LLC v. Sony Corp.*, the Ninth Circuit held that the Copyright Act's definition of willful infringement—infringement that occurs "'with knowledge that the defendant's conduct constitutes copyright infringement'"—is the standard by which courts should assess whether willful infringement bars the application of laches. 263 F.3d at 957 (quoting *Columbia Pictures Television v. Krypton Broad.*, 106 F.3d 284, 293 (9th Cir.1997) (alterations and omissions in original) *rev'd on other grounds sub nom. Feltner v. Columbia Pictures Television*, 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998)). At least one other district court in the Ninth Circuit has applied this standard to trademark infringement, and the parties do not dispute that it applies here. *See FLIR Sys. Inc. v. Sierra Media, Inc.*, 965 F.Supp.2d 1184, 1210 (D.Or.2013).

■ Fitbug points to four facts that it believes demonstrate willful infringement. First, "it is undisputed that Fitbit learned about Fitbug nearly two years before selling any products (and nearly one year before even announcing such products)." Fitbug Opp'n at 3. Second, pointing to screenshots of Fitbit's and Fitbug's websites, Fitbug argues that "Fitbit ... borrowed significant design elements from Fitbug's website, marketing materials, and original logo." *Id.*; Landau Decl. Exs. 15–18. Third, Fitbit continued using its marks after receiving a cease and desist letter from Fitbug alleging infringement. Finally, Fitbug disputes Fitbit's view that "it began using the FITBIT mark before learning of Fitbug's prior rights in FITBUG." Fitbug Opp'n at 3 n.2.

The willfulness exception is inapplicable here because Fitbug can show "at most only infringement, not willful infringement," *Danjaq*, 263 F.3d at 958, and Fitbug has offered no evidence "demonstrating that [Fitbit] 'employed the alleged infringing mark with the wrongful intent of capitalizing on its goodwill.'" *RSI Corp. v. IBM Corp.*, No. 5:08–CV–3414–RMW, 2012 WL 3277136, at *20 (N.D.Cal. Aug. 9, 2012). First, while it is undisputed that Fitbit learned about Fitbug prior to announcing or selling its products, in the bad faith infringement context numerous courts have found that "[p]rior knowledge of a senior user's trademark does not necessarily give rise to an inference of bad faith and may be consistent with good

faith." *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 397 (2d Cir.1995); *see also McCarthy* § 23:115 at n.13 (collecting cases). Nevertheless, Fitbug suggests that the Court should infer bad faith here because "defendant had knowledge of plaintiff's mark 'and 'just happened' to choose a mark confusingly similar to plaintiff's mark.'" Fitbug Opp'n at 3 n.2 (quoting *McCarthy, supra,* at § 23:115). But this overstates the facts. First, as the Court discussed earlier, there is no evidence that Fitbit was aware of Fitbug's mark at the time it chose the Fitbit name. Instead, the record simply demonstrates that Fitbit was ignorant of Fitbug's existence until late 2007, after it chose the Fitbit name but before it announced or began marketing its products under that name. Furthermore, even though Fitbit was aware of Fitbug prior to announcing or marketing its products, Fitbug provides no evidence disputing Fitbit's asserted good faith belief that its use is not infringing and nothing showing a "wrongful intent of capitalizing on [Fitbug's] goodwill." *RSI,* 2012 WL 3277136, at *20 (quotation omitted). On the contrary, it is undisputed that, at the time he learned of Fitbug, Fitbit's CEO believed the names were not confusingly similar. As the Ninth Circuit has recognized, citing approvingly a case from the Sixth Circuit, "a knowing use in the belief that there is no confusion is not bad faith." *Lindy Pen Co., Inc. v. Bic Pen Corp.,* 982 F.2d 1400, 1406 (9th Cir.1993) (citing *Nalpac, Ltd. v. Corning Glass Works,* 784 F.2d 752, 755 (6th Cir.1986)).

As a result, the Court finds that willful infringement does not bar Fitbit from invoking laches, and Fitbug's claims are time-barred. Accordingly, Fitbit's motion for summary judgment on the issue of laches is GRANTED. Further, because Fitbug's claims are time-barred, the portion of Fitbit's motion for summary judg-

ment addressing acquiescence need not be addressed, and Fitbug's motion for summary judgment on likelihood of confusion is DENIED as moot.

**B.** *Fitbit's Fifth and Sixth Counterclaims*

The only remaining issue is Fitbug's motion for summary judgment as to Fitbit's fifth and sixth counterclaims, which assert claims for violations of California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL"). *See* Cal. Bus. & Prof.Code §§ 17200; 17500. These causes of action relate to allegations that Fitbug violated the UCL and FAL by posting online reviews and comments about Fitbit products or comparing Fitbit's products to Fitbug's without disclosing their affiliations with Fitbug.

 Fitbug argues that it is entitled to summary judgment on these claims because Fitbit cannot satisfy the requirement that a UCL or FAL plaintiff demonstrate it "suffered injury in fact and … lost money as a result of" the unfair competition or false advertising. *See Id.* §§ 17204; 17535. Because a UCL or FAL plaintiff must demonstrate an economic injury and demonstrate that "the misrepresentation was an immediate cause" of the injury suffered, standing under the UCL and FAL is "substantially narrower than federal standing under [A]rticle III." *In re Tobacco II Cases,* 46 Cal.4th 298, 326, 93 Cal.Rptr.3d 559, 207 P.3d 20 (Cal.2009) (internal citation and quotation marks omitted); *see also Kwikset Corp. v.Super. Ct.,* 51 Cal.4th 310, 323–24, 120 Cal.Rptr.3d 741, 246 P.3d 877 (Cal.2011).

The background of this issue is somewhat convoluted, but it stems from a stipulation the parties entered into in response to Fitbit's desire to amend its counterclaims late in the discovery process. When Fitbit sought to amend its counterclaims, Fitbug apparently sought to depose

a Fitbit representative regarding those counterclaims. Fitbit initially agreed, but then the parties reached an agreement that, in exchange for not providing the witness for deposition, Fitbit and Fitbug would stipulate that, among other things, Fitbit did not have evidence of "particular instances where individuals who otherwise would have purchased Fitbit products instead purchased Fitbug products in reliance on or as a result of Fitbug's conduct" that allegedly violated the UCL and FAL. ECF No. 49 ("Rosenberg Decl.") Ex. 17 at ¶ 1.

In response, Fitbit points to several cases holding that, in the Lanham Act context, injury in fact may be presumed for intentionally deceptive advertising. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir.1997); *U–Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040 (9th Cir.1986); *Nat'l Prods., Inc. v. Gamber–Johnson LLC*, 699 F.Supp.2d 1232, 1241 (W.D.Wash.2010). But these cases do not rebut Fitbug's argument. Fitbug's argument is that, *as a matter of California law*, the statutory standing requirement imposed by Business and Professions Code Sections 17204 and 17535 require Fitbit to demonstrate an economic injury cognizable under the UCL or FAL. These cases only address those requirements in the context of the Lanham Act, and are thus inapposite.

■ Next, Fitbit points to California cases holding that a UCL or FAL plaintiff can satisfy the statutory standing requirements in "innumerable ways" and that "the quantum of lost money or property necessary to show standing" under the UCL and FAL is "only so much as would suffice to establish injury in fact and it suffices to allege some specific, identifiable trifle of injury." *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal.App.4th 544, 561, 153 Cal.Rptr.3d 865 (Cal.Ct.App.2013) (citations and internal quotations omitted). However, Fitbit cannot satisfy even that standard. Instead, Fitbit's sole basis for asserting an injury under the UCL and FAL is speculation. While Fitbit points out that Fitbug saw an increase in web traffic and sales following the alleged UCL and FAL violations, Fitbit cannot connect that increase with any "quantum of lost money or property" it suffered. *Id.* Similarly, while Fitbug internally estimated that this campaign would generate significant revenues, there is nothing in the record demonstrating that the campaign actually was responsible for any loss of money or property by Fitbit.

As a result, Fitbit has failed to demonstrate even a "specific, identifiable trifle of injury" sufficient to satisfy the standing requirements of the UCL or FAL. *Id.* Accordingly, Fitbug's motion is GRANTED as to Fitbit's fifth and sixth counterclaims.

## V. CONCLUSION

For the reasons set forth above, Fitbit's motion for summary judgment on the grounds of laches is GRANTED. Because Fitbug's claims are time-barred, the Court need not address Fitbit's arguments for summary judgment on the grounds of acquiescence, and Fitbug's motion for summary judgment on the grounds of likelihood of confusion is DENIED as moot. Fitbug's motion for summary judgment on Fitbit's fifth and sixth counterclaims is GRANTED. Because, based on the Court's review of the parties' pleadings this order fully disposes of the parties' claims, the trial date, pretrial conference, and all other pretrial deadlines are hereby VACATED.

IT IS SO ORDERED.